HOWARD MCCUTCHEON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24401, 25554. Promulgated January 15, 1930.

*J. D. Bowersock, Esq.*, for the petitioner.
*Philip M. Clark, Esq.*, for the respondent.

836

OPINION.

LANSDON: In these proceedings it is not questioned that the advances made by the petitioner to Hasbrook constituted a bona fide debt, nor that the amount claimed as a deduction in each taxable year was charged off in such year as worthless. The only question is whether the facts justified the petitioner's action in ascertaining the respective portions of the debt to be worthless.

The Revenue Act of 1921 provides in section 214 (a) (7) that, in computing the net income of an individual, there shall be allowed as deductions debts ascertained to be worthless and charged off within the taxable year, and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part.

The respondent disallowed the claimed deductions on the theory that the petitioner's debt was secured by the stock of the newspaper corporation, and since the corporation was not liquidated until subsequent to the taxable years, the amount of the debt which became worthless in such years could not be ascertained. The only evidence we have on this point is the testimony of the petitioner, who stated under oath that the stock certificates were endorsed in blank by Hasbrook and turned over to him, the petitioner, in 1917 without any agreement respecting the disposition of the stock. He further testified as follows:

Q. Did you ever hold that stock, at all, or have the certificates in your possession, or—?

A. The stock was in my possession, yes, sir.

Q. When?

A. Well, I had him turn it over to me in 1917, on the occasion of a visit there.

Q. State the occurrence, Mr. McCutcheon?

A. Well, my only thought at that time was that the stock would be safer in my hands, perhaps, than it would be in his; that, in an extremity, he might be inclined to hypothecate it, make a loan on it, or something of that sort, and I didn't want that to happen.

 *  *  *  *  *  *  *

Q. Did you ever have any conversation with Mr. Hasbrook with regard to that stock being pledged to you?

A. No; it never was pledged to me, at all.

Q. What became of it, Mr. McCutcheon, the stock?

A. I sent it to him and it was turned over when the sale was made.

Q. In 1927?

A. 1927.

We are unable to conclude from this testimony that the petitioner's debt was secured by the stock of the corporation, but if it were in effect so secured, we think, in the circumstances disclosed here, such fact would not justify disallowance of the deductions claimed.

At the beginning of the first taxable year, 1921, Hasbrook was approximately 70 years of age, in bad health, and almost blind. It was extremely improbable that he would ever be able to earn enough money to pay any substantial part of the debt. The assets of the newspaper corporation constituted the only probable, if not possible, source of recovery of any portion of the petitioner's debt. There is nothing to indicate that Hasbrook was not entirely willing to pay over to the petitioner the net proceeds from the sale of the newspaper to apply on his indebtedness, and the net proceeds were in fact so applied when the plant was finally sold in 1927. During the taxable years, then, the petitioner could look only to the net assets of the newspaper corporation, the stock of which was owned by Hasbrook, for reimbursement of his advances, and anything that oc-

curred to reduce the net value of those assets increased to that extent the worthlessness of the debt.

At December 31, 1920, the petitioner's total advances to Hasbrook amounted to $23,867.51, of which he had been repaid $800.31. The newspaper plant had been purchased in 1909 for $26,599, and the only addition in the way of new equipment was a typesetting machine, the cost of which was not established, but which undoubtedly was not more than sufficient to offset exhaustion and wear and tear of the plant generally. It was perfectly apparent that the newspaper plant had not appreciated in value, nor was there any reasonable expectation of such an increase. On the other hand, it was apparent that the plant did not at any time subsequent to 1920 have a gross value in excess of approximately $25,000. Since the indebtedness due the petitioner in 1920 was almost equal in amount to the gross value of the plant, any further advances in the taxable years must have constituted worthless debts when made, or any events which occurred in the taxable years to reduce the net value of the newspaper assets rendered the petitioner's debt to that extent uncollectible.

" The ascertainment of the worthlessness of a debt, either in whole or in part, is the exercise of sound business judgment based upon as complete information as is practically obtainable." *John E. Saddler*, 2 B. T. A. 1305. Such an ascertainment must be viewed in the light of the surrounding facts and circumstances, which must be such as to cause a reasonably prudent business man to conclude that the debt is worthless to the extent so ascertained. A remote hope of ultimate salvage is not sufficient to deny a deduction. " The taxing act does not require the taxpayer to be an incorrigible optimist." *United States* v. *White Dental Mfg. Co.*, 274 U. S. 398.

In the case last cited, the Supreme Court in its opinion said:

The statute obviously does not contemplate and the regulations * * * forbid the deduction of losses resulting from the mere fluctuation in value of property owned by the taxpayer. * * * But with equal certainty they do contemplate the deduction from gross income of losses which are fixed by identifiable events, such as the sale of property * * *, or caused by its destruction or physical injury * * * or, in the case of debts, by the occurrence of such events as prevent their collection * * *.

What events, then, occurred in the taxable years to prevent the collection of the petitioner's debt to the extent he determined it to be worthless and charged it off? We will consider the three years separately.

In 1921, the petitioner was advised that the newspaper had sustained an operating loss for the previous year of approximately $6,000. This loss could be met only out of the assets of the plant

or by the petitioner increasing his advances. In either event, the debt became worthless in that amount. It is true that in 1921 he received $665 from the sale of Hasbrook's old home in Kansas City, but this credit was in part offset by the amount of interest which the petitioner was required to pay on Hasbrook's $4,000 note. From these facts, we think the petitioner was justified in ascertaining in 1921 that the indebtedness had become worthless in the amount of $5,000, which amount he charged off and claimed as a deduction from his income for that year.

In 1922, the petitioner learned that Hasbrook had secured bank loans in the amount of $5,000 (which amount was ultimately increased to more than $7,000 before the newspaper plant was sold in 1927), and for the preceding year 1921, the newspaper produced an operating profit of only $100. These facts, in our opinion, also sustain the petitioner's action in ascertaining in 1922 that the indebtedness due to him from Hasbrook became worthless in the amount of $5,000.

In 1923, the petitioner was required to pay Hasbrook's note to the bank for money borrowed in 1909 to make the first payment on the newspaper plant, which note the petitioner had endorsed. The amount paid by the petitioner in 1923 on this note was $4,067.14, which became a worthless debt at the time of payment. In addition, the petitioner learned in 1923 that the newspaper was operated during the preceding year at a loss of $800, and in December, 1923, the petitioner advanced $200 for a pay-roll in order to keep the plant in operation. Efforts were being made to sell the newspaper, and the chances of sale would have been impaired if publication had been suspended. In the light of these facts, we think the action of the petitioner in ascertaining in 1923 that his debt had become uncollectible in the additional amount of $5,000 was reasonable.

Not only did the circumstances in the respective taxable years justify the petitioner's actions, but the events in the subsequent years fully demonstrated the soundness of his judgment. When the newspaper plant was sold in 1927, after paying the debts of the corporation, there remained the net amount of only $8,000 which could be applied in payment of the petitioner's indebtedness, leaving a substantial amount to be charged off in excess of the amounts here claimed as deductions.

The respondent erred in disallowing the deductions in question, and the deficiencies should be recomputed accordingly.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

MURDOCK dissents.