Yara Engineering Corporation, a corporation of the State of New Jersey v. Commissioner.
Yara Engineering Corp. v. Commissioner
Docket No. 88159.
United States Tax Court
T.C. Memo 1963-283; 1963 Tax Ct. Memo LEXIS 62; 22 T.C.M. (CCH) 1448; T.C.M. (RIA) 63283; October 16, 1963
*62 Charles Goodwin, Jr., and William J. Geen, for the petitioner. William Fallon, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1955 and 1956 in the amounts of $28,447.62 and $16,716.08, respectively. The issues for decision are: (1) Whether the profits realized by petitioner from the sales of certain parcels of real estate in its taxable years 1955 and 1956 constituted ordinary income from the sale of property held primarily for sale to customers in the ordinary course of trade of business or capital gains. (2) Whether petitioner is entitled to a deduction of $3,837.80 as a bad debt loss in the taxable year 1955. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, Yara Engineering Corporation, was organized under the laws of the State of New Jersey on May 9, 1932. Its principal office, during the taxable years here involved was in Elizabeth, New Jersey. Petitioner's Federal income tax returns for the calendar years 1955 and 1956 were filed with the district director of internal revenue at Newark, New Jersey. During the taxable *63 years 1955 and 1956 and at various times since its founding in 1932, petitioner has engaged in various enterprises, including roadbuilding equipment sales, gas transmission pipe sales, aerial tramway design and sales, metal mining prospecting and testing, clay drilling and prospecting, investment in clay lands and in affiliated companies, and real estate transactions. Petitioner's certificate of incorporation is of the type commonly known as a "general purpose" charter. This certificate authorizes petitioner, among other things, to: purchase, lease, hire or otherwise acquire, real * * * property, improved and unimproved of every kind and description, or any interest therein or lien thereon, and to sell, convey, exchange, dispose of, lease, release, hire or mortgage said property, or any part thereof * * * From the time of its incorporation in 1932, up to and including the year 1956, one of the principal stockholders of petitioner was Edward J. Grassmann, hereinafter sometimes referred to as Grassmann, of Elizabeth, New Jersey. Grassmann was the treasurer, one of three vice presidents, and a director of petitioner during these years. Capital Gains Issue Grassmann began his career in *64 1902 as a surveyor's apprentice in what is now the City of Elizabeth. Subsequently he attended night school and obtained a degree in civil engineering. In connection with his surveying work, he developed an interest in real estate and in titles of land in the Elizabeth area, which titles were at that time in a confused state owing to the abandonment of many pieces of property by settlers moving west following the American Revolution. Grassmann developed the practice of tracing many of these obscure titles by searching real estate records and making inquiries of local farmers. In 1910 he became an assistant engineer for the Central New Jersey Railroad Commission charged with inspection and valuation of 860 miles of railroad in New Jersey. In 1913 Grassmann was approached by the Central Railroad of New Jersey (hereinafter sometimes referred to as Central Railroad) and asked to clear up Central Railroad's titles to real estate which it occupied but did not own, and Grassmann undertook to do this. In 1915, Grassmann was requested by Central Railroad to undertake to assemble by purchase a tract of land which that company wanted for a freight yard. Grassmann agreed to attempt to purchase *65 this land for Central Railroad. He hired lawyers to work on titles and several girls to search deeds, and began the purchase of the property. This program continued until about 1950, during which time Grassmann purchased about $3,000,000 worth of land for Central Railroad. This program was highly confidential, Grassmann receiving funds from Central Railroad in cash and taking title to the land in his own name or the names of various corporations. During this period, Grassmann also had advised Central Railroad on such real estate matters as tax rates, tax valuation, and condemnation. During the time Grassmann was engaged in purchasing property for Central Railroad, he also made similar purchases for several other industrial clients, including a gas company and a water company. During the course of Grassmann's land purchasing program for Central Railroad it developed that certain landowners would not sell property wanted by that company unless other property which they owned was also purchased at the same time. Central Railroad suggested that Grassmann acquire this other land, which it did not want, for his own account, and offered to make allowances so that Grassmann would pay a reduced *66 price if he would do so. A considerable amount of land in the City of Elizabeth was thus acquired by Grassmann for his own account. Substantially all of the land thus acquired by Grassmann for his own account was transferred to his wholly-owned corporation, Consolidated Corporation, which was engaged in the construction business. During 1931 Consolidated Corporation encountered financial difficulties, as a result of which petitioner was incorporated as a subsidiary of Consolidated and all of the unencumbered real estate owned by Consolidated, together with the construction business, was transferred to petitioner in exchange for stock. Encumbered real estate was transferred to other Consolidated subsidiaries. Grassmann has received fees totaling over 1 million dollars in connection with advising clients concerning the purchase of real estate and representing them in condemnation proceedings. Although he has never held a license as a real estate broker, nor received commissions for selling real estate, nor fees for real estate appraisals, in view of his activities in the real estate field, Grassmann is very well known in New Jersey real estate circles. During 1955 and 1956, 38 percent *67 of petitioner's common stock was owned by Grassmann. During the entire period from 1932 through 1956 Grassmann has been the person basically responsible for making policy decisions for petitioner, including decisions with respect to real estate. Grassman has personally conducted the negotiations for the purchase and sale of real estate by petitioner since 1932. During the years 1955 and 1956, petitioner sold the following parcels of real estate: 1955
Year
Sales
Cost or
Property
[1]acquired price
other basis
Gain
[2] 942-944 Port Ave., Elizabeth, N.J. 1918
$ 3,564.13
$ 2,644.85
$ 919.28
Fairmount Ave. & Woodruff Lane, Elizabeth,
N.J. [2]
1923
29,968.25
2,848.78
27,119.47
[2]447-459 Trinity Place, Elizabeth, N.J. 1949
14,000.00
3,150.00
10,850.00
[2]330-338 Atlantic St., Elizabeth, N.J. 1927
5,000.00
889.39
4,110.61
236-250 & 300-322 Johnston Ave., Plainfield,
N.J. [2]
1948
23,000.00
4,746.70
18,253.30
3.995 Acre Tract, Mountain Ave., New Provi-
n2dence, N.J. 1948
35,000.00
7,201.76
27,798.24
Lots 17 & 18, Fox Trail, Mountainside, N.J.
1927 &
1941
6,000.00
858.96
5,141.04
Lot 15, Dogwood Way, Mountainside, N.J.
1927
4,200.00
398.69
3,801.31
Lots 9-25 & 9-30, McMane Ave., Berkeley
Heights, N.J.
1930
7,680.00
218.12
7,461.88
Lot 15, Far View Dr., Scotch Plains, N.J.
1926
39,000.00
38,336.56
663.44
Lot 21, Forest Hill Way, Mountainside, N.J.
1927
4,000.00
3,252.28
747.72
Lot 675, Exeter Way, Hillside, N.J.
1927
4,750.00
2,469.05
2,280.95
Lots 37 & 38, Fox Trail, Mountainside, N.J.
1927
6,000.00
410.07
5,589.93
Lot, Mountain Ave., New Providence, N.J.
1955
18,000.00
17,469.49
530.51
Lots 24 & 25, Fox Trail, Mountainside, N.J.
1927
5,000.00
455.64
4,544.36
Lot 22, Forest Hill Way, Mountainside, N.J.
1927
3,825.00
2,769.65
1,055.35
Lot 652, Nottingham Way, Hillside, N.J.
1927 &
1928
4,017.50
3,052.65
964.85
Lot 19, Dogwood Way, Mountainside, N.J.
1927
3,600.00
1,500.00
2,100.00
Lot 513, Windsor Way, Hillside, N.J.
1927 &
1928
4,400.00
1,597.12
2,802.88
Lot 35 D Fox Trail Mountainside, N.J.
1927
4,500.00
493.61
4,006.39
Lot 12, Deer Path, Mountainside, N.J.
1927
4,000.00
379.70
3,620.30
Lot 6, Revere Drive, Hillside, N.J.
750.00
(750.00)
Lot 9, Far View Drive, Scotch Plains, N.J.
1926
6,260.00
645.24
5,614.76
Lot 41, Deer Path, Mountainside, N.J.
1927
$ 400.00
$ 37.97
$ 362.03
Lot 7, Far View Drive, Scotch Plains, N.J.
1926
6,250.00
713.76
5,536.24
Lot 14, Nottingham Way, Hillside, N.J.
1927 &
1928
10,380.00
5,877.23
4,502.77
(Adjustment for sewer assessments)
(1,155.60)
Total gains realized on 1955 real estate transactions
$148,472.01
1956
[2]801-853 Meadow St., Elizabeth, N.J. 1949
$15,933.33
$ 1,270.63
$ 14,662.70
[2]918-924 Augusta St., Elizabeth, N.J. 1946
2,537.31
629.50
1,907.81
[2]918-924 Augusta St., Elizabeth, N.J. 1946
358.17
82.94
275.23
[2]512 Westminster Ave., Elizabeth, N.J. 1952
24,305.00
20,111.06
4,193.94
[2]527-531 So. Fifth Street, Elizabeth, N.J. 1925
4,500.00
3,249.34
1,250.66
[2]1400-22, 1428-46 Lower Rd., Elizabeth, N.J. 1926 &
1951
16,230.44
4,905.15
11,325.29
[2]Meadowland, Elizabeth, N.J. 1926
49,904.64
14,944.45
34,960.19
[2]High Street, Elizabeth, N.J. 1954
1,935.40
646.62
1,288.78
[2]901-919 Fairmount Ave., Elizabeth, N.J. 1921
7,500.00
1,638.10
5,861.90
[2]801-853 Meadow St., Elizabeth, N.J. 1949
46,353.37
2,933.96
43,419.41
Lot 1, Grouse Lane, Mountainside, N.J.
1927
2,000.00
1,184.50
815.50
Lot 2, Grouse Lane, Mountainside, N.J.
1919
6,484.00
2,842.80
3,641.20
Lot 3, Grouse Lane, Mountainside, N.J.
1919
6,330.00
2,605.90
3,724.10
Lot 7, Grouse Lane, Mountainside, N.J.
1927
2,000.00
1,184.50
815.50
Lot 8, Grouse Lane, Mountainside, N.J.
1919
6,261.00
2,369.00
3,892.00
Lots 1 & 2, Meeting House Lane, Mountain-
side, N.J.
1941
10,000.00
2,509.39
7,490.61
Lot 10, Far View Dr., Scotch Plains, N.J.
1926
9,375.00
713.76
8,661.24
Lot 12, Far View Dr., Scotch Plains, N.J.
1926
6,000.00
605.26
5,394.74
Lot 4, Mtg. Hse. Ln. Mountainside, N.J.
1941
6,000.00
1,265.07
4,734.93
Lot 40 D, Meeting House Lane, Mountainside,
1932 &
N.J.
1941
5,000.00
550.56
4,449.44
Lot 9 D, Meeting House Lane, Mountainside,
1927 &
N.J.
1941
5,000.00
1,843.05
3,156.95
Lot 685, Surrey Rd., Hillside, N.J.
1927 &
1928
5,200.00
2,121.28
3,078.72
Lot 699, Surrey Rd., Hillside, N.J.
1927 &
1928
25.00
20.84
4.16
Lot 698, Surrey Rd., Hillside, N.J.
1927 &
1928
8,750.00
5,531.76
3,218.24
Lots 9-24, McMane Ave., Berkeley Heights,
N.J.
1930
4,320.00
109.06
4,210.94
Lot 1, Skytop Dr., Mountainside, N.J.
1919
4,500.00
4,500.00
Lot 13, Skytop Dr., Mountainside, N.J.
1919
549.20
549.20
Lot 663, Haviland Dr., Hillside, N.J.
1927
4,400.00
2,707.18
1,692.82
Lot 226, Exeter Way, Hillside, N.J.
1954
45,000.00
37,791.47
7,208.53
Lots 1-6, Fifth Ave., Elizabeth, N.J.
1927
13,100.00
11,063.83
2,036.17
Lot, Hillside, N.J. (Pingry)
1927 &
1928
15,130.00
13,613.22
1,516.78
Far View Dr., Scotch Plains, N.J.
200.00
(200.00)
Total
$193,737.68
*68 The properties which petitioner sold in 1955 and 1956 and reported as capital gain transactions were not segregated on its books and records from those other properties which it sold in the same years and reported as ordinary income transactions. The 42 properties which petitioner sold in 1955 and 1956, or 20 and 22 sales, respectively, and reported as ordinary income transactions, were, with one exception, located in suburban areas and involve parcels subdivided by petitioner. The exception was land located in the city of Elizabeth, New Jersey, identified as lots 1-6, Fifth Avenue. This property was located within the city *69 limits of Elizabeth and within 2 blocks of an area adjacent to the entrance of the New Jersey Turnpike. Petitioner reported the aggregate gain of $134,012.88 on these sales as ordinary income. The 16 properties which petitioner sold in 1955 and 1956, 6 and 10 sales, respectively, and reported as capital gain transactions were, with two exceptions, located in the urban areas of Elizabeth and Plainfield, New Jersey. The exceptions were a parcel located in New Providence, New Jersey, sold in 1955, known as the 4-acre tract, Mountain Avenue, and a parcel located in Elizabeth and sold in 1956, identified as Meadowland. Grassmann received between 200 or 300 inquiries each year from prospective purchasers of petitioner's subdivided properties and other real estate. Many of these inquiries were as a result of prospective purchasers having consulted local real estate records which showed petitioner as the record title holder of a large amount of property or from persons who were informed of petitioner's real estate holdings by real estate brokers. Most of the real estate brokers and agents in the area where petitioner was located knew that petitioner held a large amount of real property. Grassmann *70 came to the offices of petitioner almost every Saturday morning to interview prospective purchasers of petitioner's real estate. He spent approximately an hour or an hour and a half talking to those persons interested in purchasing real property from petitioner. His purpose in coming to the office on Saturday morning was to keep weekdays free from real estate negotiations. On occasion Grassmann would talk to representatives of large corporate prospective purchasers of petitioner's real estate on weekdays. Negotiations for all of the sales of petitioner's real estate (both those reported as resulting in capital gain and those the profits from which were reported as ordinary income) in 1955 and 1956 were handled in substantially the same way by Grassmann. Grassmann's general policy was to listen to the reasons given by prospective purchasers of petitioner's real estate for seeking the property in question, and their plans for development of the property. On the basis of this information, he would decide whether or not he wished to sell the property. Grassmann would not agree to sell petitioner's property unless he was satisfied as to the prospective purchaser's intended use. Many offers *71 to buy were refused by Grassmann. Once Grassmann had decided to sell, he would set the price, refusing to bargain on this point. Beginning about 1940, the local governments in Scotch Plains, Mountainside, Hillside and Berkeley Heights, and New Providence, New Jersey, laid out and constructed new roads in areas where petitioner then owned tracts. In order to obtain funds with which to pay its share of the assessment for these roads, petitioner began to subdivide some of these tracts and sell the lots for residential purposes. When petitioner began to sell the subdivision lots it reported the gain as ordinary income because Grassmann was advised that subdivision sales had to be so treated. Prior to 1954 petitioner reported the gains on all real estate sales as ordinary income without regard to the nature of the transaction. Petitioner's bookkeepers, who prepared the income tax return, did not consult Grassmann as to whether any sales of real estate should be reported as resulting in capital gains. Grassmann, however, signed many of petitioner's Federal income tax returns. In 1953 Grassmann received information that not all gain from real estate sales need be reported as ordinary income *72 and he instructed petitioner's bookkeepers thereafter to report as transactions resulting in ordinary income, sales of petitioner's subdivided property and to report the profits from petitioner's other real estate sales as capital gains. Some of the properties, the profit from the sales of which petitioner reported as capital gains in 1955 and 1956, were portions of tracts from which profits from previous sales had been reported as ordinary income. During the years 1932 to 1956, inclusive, petitioner sold the following number of parcels of real estate: Year
Number
1932
0
1933
0
1934
1
1935
0
1936
1
1937
2
1938
0
1939
2
1940
11
1941
26
1942
14
1943
14
1944
12
1945
12
1946
42
1947
9
1948
10
1949
20
1950
18
1951
15
1952
15
1953
11
1954
10
1955
26
1956
32
Total
303 Of the parcels listed as sold between 1940 and 1956, inclusive, approximately 251 were parcels located in the subdivision tracts. During the years 1932 to 1956, inclusive, petitioner purchased the following number of parcels of real estate: Number
1932
0
1933
0
1934
0
1935
0
1936
0
1937
1
1938
3
1939
1
1940
1
1941
6
1942
3
1943
2
1944
1
1945
2
1946
8
1947
0
1948
6
1949
10
1950
8
1951
12
1952
10
1953
6
1954
7
1955
9
1956
18
Total
114 Of these 114 transactions, between 22 and 24 were for the purpose of clearing title to properties *73 in which petitioner already had an interest, or of straightening lines of properties owned by petitioner. Some of the remaining purchases were for the purpose of reinvesting proceeds of involuntary conversions in order to defer income taxes, or were properties taken in part payment of the sales price of other property, or were transactions in which petitioner took title for others but itself had no financial interest. Of the total of 114 purchases, 26 were new acquisitions other than reinvestment of conversion proceeds, clearing titles and the like. Petitioner also acquired some real estate in 1948 upon the liquidation of its wholly-owned subsidiary, Buffalo Construction Corporation, some of which had been originally acquired by Grassmann, or by Consolidated Corporation, prior to 1932. Petitioner as of the end of 1956 had a large amount of real estate holdings. The aggregate "cost or other basis" of the real property owned by petitioner increased from $583,499.21 as of December 31, 1954, to $612,942.93 as of December 31, 1955, and then to $621,503.22 as of December 31, 1956. For the years 1955 and 1956 petitioner on its Federal income tax returns reported gross income, taxable income *74 and income from sales of real estate as follows: * Income
from Real
Gross
Taxable
Estate
Year
Income
Income
Sales
1955
$1,250,697.12
$416,197.07
$148,472.01
1956
1,214,627.61
350,264.35
201,651.99
The circumstances under which petitioner acquired, held, and later sold each of the six properties the gain from the sale of which it reported in 1955 as capital gain were as follows: 942-944 Port Avenue, Elizabeth, New Jersey On August 15, 1955 petitioner sold to Glasofer Truck & Parts Co. (hereinafter referred to as Glasofer) a parcel of vacant land for its use in plant expansion for a gain of $919.28. This *75 parcel was part of a tract of vacant land purchased in 1918 by Grassmann in connection with his purchasing activities for Central Railroad, being land which it was necessary for him to purchase in order to acquire other property for Central Railroad. In 1923 the entire tract was conveyed by Grassmann to Consolidated. Consolidated subsequently conveyed the tract to petitioner following petitioner's incorporation in 1932. In 1932 at the urging of the City Attorney of Elizabeth, petitioner sold a portion of the tract to Glasofer for the construction of a truck distribution center. Later in 1932 petitioner conveyed the balance of the tract to Buffalo Construction Corporation, a wholly-owned subsidiary of Consolidated; in 1942 petitioner acquired all of the stock of Buffalo and in 1948 Buffalo was liquidated and petitioner reacquired the property. In 1948 Buffalo sold a second portion of the tract to Glasofer, and in 1954 petitioner sold a third tract to Glasofer. The sales in 1948 and 1954 as well as the 1955 sale were made at the urging of Glasofer's representative in order to provide room for expansion of the Glasofer plant. Petitioner, at the time of the trial of this case, still held *76 the balance of this tract, approximately one-half of the original tract. During the period this property was held by petitioner, a sewer was installed in Julia Street by the City of Elizabeth, and petitioner paid the resulting assessment therefor. One of the adjoining streets was paved by the city. No other improvements were made on this property during the time it was held by petitioner or its predecessor. Fairmount Avenue at Woodruff Lane, Elizabeth On July 13, 1955, petitioner sold to Bryant Essick this parcel of vacant land for the construction of a warehouse and office building. Petitioner realized a gain on the sale of this parcel in the amount of $27,119.47. This property was the last parcel of a larger tract of 9.3 acres originally acquired by Grassmann in 1923 in connection with his purchasing activities for Central Railroad and placed in the name of Consolidated Corporation. In 1927, at the urging of representatives of the city of Elizabeth, Consolidated sold a portion of the tract to Kuehne Chemical Company (hereinafter referred to as Kuehne) to be used for the construction of a chemical plant. In 1932 Consolidated conveyed the balance of the tract to Buffalo, its subsidiary. *77 In each of the years 1932, 1943, 1944 and 1945 Buffalo sold a parcel of the tract to Steinbacher Packing Co. for a packing plant. The initial sale in 1932 was at the request of a prominent local politician in Elizabeth who had been instrumental in helping Grassmann secure State legislation which aided in clearing real estate titles. The subsequent three sales to Steinbacher were for plant expansion. In 1932 Buffalo sold a second parcel from the same tract to Kuehne for plant expansion. In 1946 Buffalo gave a deed to a right-of-way to Central Railroad to clear title to property previously occupied by Central Railroad. In 1948 petitioner acquired the remaining property in liquidation of Buffalo. Then in 1952 petitioner sold a portion of the tract to Saffron Industrial Center for the construction of a warehouse. In 1955 petitioner made the sale here involved when approached by Bryant Essick who wanted to purchase land for an equipment distribution warehouse. No improvements were made on this tract from the time of its original acquisition in 1923. 447-459 Trinity Place, Elizabeth, New Jersey In October 1955, petitioner sold this property to Bruce Perlstein and Seymour Shapiro for a *78 gain of $10,850. This was a plot of vacant land purchased at a tax sale in 1949 to avoid its sale to bidders who wanted it for use as a used car lot. Petitioner's main office is located across the street from this lot in a colonial building built in 1773 and on the opposite corner, is another colonial building used by Georgia Kaolin Company, an affiliated company of petitioner's of which Grassmann is president. Prior to 1955, several offers to purchase this lot were made but were rejected by petitioner. However, in 1955 when Perlstein and Shapiro agreed in writing to construct an attractive warehouse on this property in accordance with specifications acceptable to petitioner, petitioner sold the property to them. No improvements were made to the property during the period it was held by petitioner. 330-338 Atlantic Street, Elizabeth, New Jersey In October 1955 petitioner sold this plot for a gain of $4,110.61 to P. Farley Realty Co. for the construction of a motel. This property is a corner lot and was half of a larger parcel of vacant land, which together with other parcels of vacant land located in the adjacent four-block area was originally purchased by Consolidated in 1927 in *79 connection with Grassmann's purchasing activities on behalf of Central Railroad, and later conveyed to petitioner. In 1949 petitioner sold two lots to Harry Immerman which were located in the adjacent two-block area. In 1950 petitioner sold the first half of the parcel from which the instant sale was made, together with the vacant land owned by petitioner and located in the adjacent two-block area to the New Jersey Turnpike Authority under threat of condemnation. The land sold to Harry Immerman was sold in 1950 to the New Jersey Turnpike Authority contemporaneously with petitioner's sale. In April 1952 another lot located in the same two-block area was sold by petitioner to the Turnpike Authority. In total eight plots have been sold through 1955 in three separate transactions, with a substantial portion of the land remaining in the hands of petitioner. One of the reasons for the 1955 sale to P. Farley Realty Co. was that taxes had been increased in this area. No improvements had been made on this property during the time it was held by petitioner or Consolidated. 236-250 and 300-322 Johnston Avenue, Plainfield, New Jersey In April 1955 petitioner sold these two tracts at a gain of *80 $18,253.30 to Herman Schwartz to be used for the construction of residential housing. This property was a portion of a tract acquired originally in the nineteen-twenties by Grassmann in the name of Bi-State Development Corporation, which was owned by Grassmann. These properties were sold at a sheriff's sale in 1948 and acquired then by petitioner. In 1955 petitioner was approached by Schwartz and by the attorney for the Town of Plainfield and was asked to sell the property to Schwartz for the construction of houses. Plat maps for the construction of 12 houses were filed, but the record does not show whether they were filed by petitioner or by Schwartz. Petitioner made no improvement to these properties. 4-Acre Tract, Mountain Avenue, New Providence, New Jersey In January 1955, petitioner sold this tract of approximately 4 acres of vacant land to American Mineral Spirits Company for a gain of $27,798.24. This land was to be used for the construction of an office building and laboratory. This property was part of a much larger parcel of land (23.8 acres) purchased in 1948 and owned by petitioner, Grassmann, Grassmann's business associate, A. J. Sauer, and by Esperanza Trading Corporation *81 (which was owned in principal part by Grassmann's relatives). In 1955 American Mineral Spirits Company approached Grassmann through certain local officials of New Providence and asked to buy land for the construction of an office building and laboratory. Taxes on the property had risen from $300 to about $5,000 per year and Grassmann thought a sale would be a wise business decision. In 1957, 2 years later and after the taxable year here in issue, petitionr sold the balance of the tract to Loubar Realty Company. The circumstances under which petitioner acquired, held, and later sold each of the eight properties, the gain from the sale of which it reported in 1956 as capital gain, were as follows: 801-853 Meadow Street, Elizabeth, New Jersey In February 1956 petitioner sold at a gain of $14,662.70 its two-thirds interest in a parcel of vacant land consisting of approximately two-thirds of an acre located at 801-853 Meadow Street to Cadillac Car Hop, Inc. to be used for the construction thereon of a drive-in restaurant. In December 1956, petitioner sold its two-thirds interest in another parcel of vacant land of approximately 4 acres located in the same tract at 801-853 Meadow Street *82 to Alloy Steel Products for a gain of $43,419.41. This parcel was to be used for the construction thereon of a manufacturing plant and warehouse and a building for office expansion. The Meadow Street property from which these two parcels were sold was a tract of approximately 10.28 acres purchased jointly in 1949 by petitioner and Emanuel Wagner, petitioner's attorney, petitioner's interest being two-thirds. The property was acquired in 1949 by petitioner and Wagner to prevent a distress sale at a price which would have been detrimental to the interest of the Central Railroad, Grassmann's client, in pending condemnation proceedings by the Port of New York Authority involving land owned in that vicinity by Central Railroad. In prior years portions of its two-thirds' interest in the tract had been sold by petitioner. In 1950 a parcel was sold to Marie K. Donahue for the construction of a gasoline station. In 1952 a parcel was sold to Magnolia Division Corporation (Nuodex) for construction of a manufacturing plant. In 1954 a parcel was sold to Albert M. Cotugno for the construction of a motel and later in 1954 another parcel was sold to Cadillac Motels, Inc. for an extension to this *83 motel. A portion of the tract on Meadow Street had not been sold in 1956 and was still owned by petitioner. In the sale to Alloy Steel and to Cadillac Car Hop, Inc. petitioner was approached by the prospective purchasers. Petitioner made no improvements to the property. 918-924 Augusta Street, Elizabeth, New Jersey On February 10, 1956, petitioner sold a small parcel of vacant land located at 918-924 Augusta Street, Elizabeth, New Jersey, to Harry Greitzer for the construction of a manufacturing plant, warehouse and offices. On January 9, 1956 petitioner had sold another parcel from the same tract to Stultz-Sickles Company for the construction of a warehouse and office. Petitioner realized gain from the sale of the two parcels in the amount of $2,183.04. The two parcels were part of a larger tract of approximately one-half acre purchased by Grassmann in 1917 or 1918. At that time certain gaps existed in titles to the property and petitioner did not finally succeed in clearing title until 1946. A portion of the tract remained in petitioner's hands after the two sales here involved. Greitzer and Stultz-Sickles approached petitioner with brokers requesting that petitioner sell these *84 parcels as part of larger tracts which they were purchasing largely from others for the construction of a manufacturing plant, warehouse and offices. This property had been improved by streets and sewers by the City of Elizabeth but petitioners made no improvements to this property. 512 Westminster Avenue, Elizabeth, New Jersey In January 1956 petitioner sold a plot located at 512 Westminster Avenue, Elizabeth, New Jersey, and the residence located thereon to the Union Foundation, a charitable organization for a gain of $4,193.94. This property was formerly the residence of the minister of St. John's Episcopal Church.during or prior to 1952 petitioner and Georgia Kaolin Company had acquired properties located across the street which they desired to use for offices, and had applied for zoning variances, which the Church opposed. Petitioner purchased the property from the Church on condition that the Church withdraw its objection to the zoning application. The Church agreed, the zoning changes were approved, and petitioner and Georgia Kaolin Company were able to use their previously acquired building for offices and a research laboratory. After acquiring the property in 1952, petitioner *85 rented it to the Cancer Society which subsequently indicated that it would like to buy the property. Petitioner sold the property to the Union Foundation which subsequently conveyed it to the Cancer Society. 527-531 South Fifth Street, Elizabeth, New Jersey In March 1956 petitioner sold at a gain of $1,250.66 the parcel of vacant land located at 527-531 South Fifth Street, Elizabeth, New Jersey, to the Police Athletic League for the construction of a boys' club. This parcel was acquired by Consolidated Corporation in 1925 when Grassmann was engaged in purchasing property in the area for the gas company, was conveyed to Buffalo in 1932 and was acquired by petitioner in the liquidation of Buffalo in 1948. The property was one of many parcels acquired by petitioner in the area where the entrance to the New Jersey Turnpike is now located. In 1956 petitioner was approached by the local police officials who wanted to purchase the property for the construction thereon of a boys' club and the property was sold.
1400-1422 and 1428-1446 Lower Road, Elizabeth, New Jersey In July 1956 petitioner sold at a gain of $11,325.29 two parcels of vacant land located at the above address to Luca Construction *86 Company to be used for the construction thereon of houses. These two parcels were part of a tract acquired by Consolidated Corporation prior to 1926 in connection with Grassmann's purchasing activities on behalf of Central Railroad. Consolidated conveyed the parcel at 1400-1422 Lower Road to Buffalo Construction Company in 1932, and it was acquired by petitioner in the liquidation of Buffalo in 1948. The parcel at 1428-1446 Lower Road, which was part of the tract originally acquired by Consolidated had been reclaimed by the City of Elizabeth for nonpayment of taxes and was repurchased by petitioner from the city at a tax sale in 1948. Two parcels from this tract had been sold either by petitioner or by its predecessor corporations either in a single transaction or in separate transactions. 16 Acres of Meadowland, Elizabeth, New Jersey In 1956 petitioner sold its 65 percent undivided interest in a tract of approximately 16 acres of vacant meadowland located in Elizabeth to Allied Chemical Corporation for a gain of $34,960.19. This sale was part of a transaction whereby Allied Chemical Corporation acquired from several parties a larger tract of approximately 119.4 acres in order to *87 construct thereon a manufacturing plant. This property, together with other property in the area, had been purchased by Grassmann in 1926 in connection with his purchasing activities for Central Railroad and from two estates which owed Grassmann a substantial amount of money and requested that he purchase their real estate in the area. The parcel was conveyed to petitioner in 1937 and in 1952 petitioner donated a 35 percent interest in the property to Union Foundation. Other property in the large tract sold to Allied Chemical was previously owned by Grassmann and his wife and by Bethel Corporation, a wholly-owned subsidiary of petitioner, but the larger portion of the 119.4 acre tract was owned beneficially by Central Railroad. No improvements were made by petitioner to this tract. High Street, Elizabeth, New Jersey In June 1956 petitioner sold a parcel of vacant land on High Street, Elizabeth, New Jersey, to Michael and Julia Esposito for their use to construct a residence thereon, realizing a gain of $1,288.78. The property was sold at the urging of officials of the city government. The lot on High Street was purchased by petitioner in 1954 at a tax sale. Petitioner after selling *88 the parcel in 1956 retained approximately two-thirds of the lot. In a 3 or 4-year period petitioner had acquired twelve to fifteen lots at tax sales by the City of Elizabeth. 901-919 Fairmount Avenue, Elizabeth New Jersey In August 1956 petitioner sold approximately two-thirds acre of vacant land located at 901-919 Fairmount Avenue, Elizabeth to Public Service Gas & Electric Company for the construction of a transformer station realizing gain in the amount of $5,861.90. This parcel was part of a larger tract of approximately 5 acres of vacant land purchased by Consolidated in 1921 and conveyed to Buffalo in 1932. Buffalo sold one parcel from this tract in 1946, three parcels in 1947, and the remaining portion was acquired by petitioner in the liquidation of Buffalo in 1948. Petitioner made one conveyance from this tract in 1950 in order to complete an installment sale originally made by Buffalo. The 5-acre tract was acquired by Consolidated in 1921 in connection with Grassmann's purchasing activities for Central Railroad. The property was sought by Public Service Gas & Electric as a site for the construction of a transformer station needed to service the Allied Chemical Corporation *89 plant. Petitioner sold the property to Public Service when Grassmann was told it was a necessary site for that Company's transformer and that the company intended to condemn the property. No improvements had been made to this property. Petitioner retained an additional parcel of this tract at the end of 1956. In connection with its sales of lots from the subdivision tracts in Hillside, Scotch Plains, Mountainside and Berkeley Heights, gains on which were reported as ordinary income, petitioner employed George Elliott, who received a salary of $25 per week, to show prospective purchasers the location of lots about which they inquired. Petitioner employed no other salesman in connection with real estate sales. Petitioner placed signs on the subdivision tracts in Mountainside, Scotch Plains, and Hillside indicating that the property was for sale. Petitioner did not otherwise advertise the subdivision properties, and did not list the properties with brokers. Petitioner did pay commissions to brokers who introduced purchasers to it. At no time did petitioner advertise for sale any of the sixteen properties the gains on the sales of which it reported in 1955 and 1956 as capital gains. Petitioner *90 did not list any of these properties with real estate brokers, nor place for sale signs on any of the properties, nor employ salesmen to sell or show the properties. George Elliott was not used to show interested parties the location of any of petitioner's properties in Elizabeth or Plainfield but only the subdivision properties the gain from the sale of which petitioner reported as ordinary income. On its Federal income tax returns for each of its taxable years 1941 through 1953 petitioner listed dealer in real estate as one of its principal business activities. Respondent in his notice of deficiency increased petitioner's taxable income as reported by considering the gain of $89,050.90 reported by petitioner as long-term capital gain on the sale of the six parcels of real estate in 1955 and the gain of $119,145.91 reported by petitioner as long-term capital gain on the sale of the ten parcels of real estate in 1956 to constitute ordinary income. Respondent in each year gave as a reason for this adjustment that these gains were derived from the sale of property held by petitioner primarily for sale to customers in the ordinary course of a trade or business. Bad Debt Issue At some *91 time prior to the beginning of World War II H. Clay Freidrichs and Frank B. Braillard requested petitioner to sell to them a tract of land located in New Providence Township, New Jersey, which petitioner had owned for many years. Freidrichs and Braillard planned to subdivide the property and build houses thereon. Grassmann knew the nature and quality of the work of Freidrichs and Braillard from another development in the area the houses in which had been constructed by Freidrichs and Braillard. Petitioner agreed to sell the tract on credit and to lend Freidrichs and Braillard the cash they needed for certain improvements to the property. Freidrichs and Braillard proceeded with the subdivision, building houses on the tract. Construction was completed at about the time of the beginning of World War II, and in an ensuing panic of mortgagors, Freidrichs and Braillard sold the houses for whatever price they could get. As a result, they were unable to pay $10,000 of the amount which they owed petitioner for the land. After discussing the matter with petitioner, Freidrichs and Braillard each agreed to assume one-half of the debt and gave notes to petitioner for such amount. Braillard executed *92 two notes, each dated January 17, 1946, in the respective amounts of $3,250 and $1,750, each payable 3 years after date. Freidrichs executed similar notes. Freidrichs eventually paid his notes in full. Braillard made some payments against his notes so that by 1955 the outstanding principal balance was reduced to a total of $3,837.80. Because of ill health with resulting medical bills and inability to work, Braillard was unable to make any additional payments. In 1955 Braillard advised petitioner that he felt he would be unable to pay any part of the remaining balance. During that year the applicable period of limitations for enforcement of the debt expired. Grassmann made various inquiries in the town of Mount Bethel where Braillard had lived for several years and where he was the publisher of a small newspaper and was advised that Braillard was deeply in debt and unable to pay his bills. Grassmann had a personal familiarity with Braillard's business activities, health and general circumstances and believed that Braillard was an honest man. Petitioner's attorneys advised Grassmann that petitioner should obtain a judgment against Braillard in order to establish the worthlessness of *93 the debt for tax purposes. However, Grassmann feared that Braillard's physical condition was so serious that this action might result in his death and accordingly declined to have petitioner institute legal action. On March 25, 1959 Braillard wrote to Grassmann stating that although his health was better his finances had not improved but that he wished to pay the debt as soon as he was able. Braillard has made no payments since prior to 1955 and has not executed any notes besides the two notes dated January 17, 1946. Petitioner on its income tax return for the year 1955 claimed a deduction in the amount of $3,837.80 because of the worthlessness of Braillard's debt to it. Respondent in his notice of deficiency disallowed this claimed deduction with the explanation that petitioner had not established that such debt became worthless during the taxable year ended December 31, 1955. Opinion Capital Gains Issue The principal issue here involved is whether petitioner's profits from the sales of 16 parcels of land during the years 1955 and 1956 constituted ordinary income or capital gain. Under the definition of capital assets contained in section 1221 of the Internal Revenue Code of 1954, *94 [1] each parcel of petitioner's real estate is a capital asset unless, as determined by respondent, it was held by petitioner in the year in which it was sold primarily for sale to customers in the ordinary course of petitioner's trade or business. The many cases dealing with the question of whether property is held primarily for sale to customers in the ordinary course of a trade or business have provided a number of factors to be used by courts as aids in determining this question. No rules-of-thumb exist, however, and the decision must rest upon a consideration of all the facts presented in the particular case. Moreover, of the various criteria, no one constitutes a decisive test. Kelley v. Commissioner, 281 F. 2d 527 *95 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court, and Estate of Peter Finder, 37 T.C. 411 (1961). Factors to be considered include the purpose for the taxpayer's acquisition of the property and disposition of it, the period of time the property is held, the continuity of sales over a period of time, the number, frequency and substantiality of sales, and the extent to which the taxpayer engaged in sales activities by developing or improving, soliciting customers, and advertising. Friend v. Commissioner, 198 F. 2d 285 (C.A. 10, 1952), affirming a Memorandum Opinion of this Court, Fritz Thompson, 38 T.C. 153 (1962) affd. on this issue, reversed on another issue, - F. 2d - (C.A. 5, Aug. 20, 1963). Petitioner contends that upon examination of each of the criteria set forth above the facts demonstrate that none of the 16 parcels involved in the 2 years here at issue was being held for sale to customers in the ordinary course of its business. Respondent, applying the same tests, comes to the contrary conclusion with respect to each parcel. The facts here are clear that petitioner was a real estate dealer. We have set forth in some detail petitioner's various real estate transactions *96 over a period of many years. Petitioner contends that even though it had for many years listed on its Federal tax returns one of its principal business activities as being a dealer in real estate and in the years here involved reported the profits from the sale of its subdivision lots as ordinary income, the facts do not show that during the years here involved it was in fact engaged in the business of a dealer in real estate. From the facts we have set forth and applying the criteria generally applied in determining whether a taxpayer is a dealer in real estate holding property primarily for sale to customers in the ordinary course of a trade or business we think it so apparent that petitioner was a dealer in real estate with respect to the sale of its subdivision lots that extended discussion of this contention of petitioner's is unwarranted. However, the fact that petitioner held certain property for sale to customers in the ordinary course of its business does not control the question of whether other property was so held. That one can hold real property for investment and at the same time hold other realty for sale to customers in the ordinary course of its business is well established. *97 Eline Realty Co., 35 T.C. 1 (1960) and Charles E. Mieg, 32 T.C. 1314 (1959). We must, therefore, consider separately the circumstances of petitioner's acquisition, holding and sale of each of the 16 parcels of land, the gains from the sales of which it contends constitute capital gains in determining whether such parcel was held for sale by petitioner in the ordinary course of its trade or business. Since respondent has determined that all the real properties sold by petitioner during the years 1955 and 1956 were held by petitioner primarily for sale to customers in the ordinary course of its trade or business, the burden is on petitioner to establish with respect to each property sold which it contends was a capital asset sufficient facts to show that it was not so held. The facts we have set forth with respect to the sale in October 1955 of the property at 447-459 Trinity Place, Elizabeth, New Jersey, and the sale in January 1956 of the property at 512 Westminster Avenue, Elizabeth, New Jersey, persuade us that petitioner did not hold these properties for sale to customers in the ordinary course of its trade or business. One of these properties was purchased by petitioner to protect *98 property used for its own business offices and the other for the purpose of enabling petitioner to use other property for offices and a research laboratory. Not only was petitioner's purchase of these properties for protection of its investments in other properties but petitioner also held the properties for this purpose. In fact, petitioner rented the property at 512 Westminster Avenue for over 3 years prior to its sale and sold it to the tenant. Petitioner refused several offers for purchase of the property at 447-459 Trinity Place and only sold it on the condition that a building meeting specifications which were acceptable to petitioner be placed thereon. We conclude that petitioner held the property at 447-459 Trinity Place and 512 Westminster Avenue primarily to protect other property used in its business and did not hold either of these properties primarily for sale to customers in the ordinary course of its trade or business. Cf. Eline Realty Co., supra.The gains on the sales of these two properties are capital gains. The situation with respect to the other 12 parcels from which the balance of the sales here in issue were made differs substantially from those with respect *99 to the Trinity Place and Westminster Avenue properties. These were properties either originally acquired by Grassmann in connection with his purchases of properties for clients and transferred to petitioner, or a predecessor corporation, or acquired by petitioner or a predecessor corporation by purchase because Glassmann considered the property a good buy. The record does not show why Grassmann transferred the properties he purchased to the various corporations. Petitioner argues that the lengthy period during which the properties had been held and the lack of advertising and sales activities establish that the properties were not held primarily for sale to customers in the ordinary course of petitioners trade or business. Petitioner points to the fact that at least 6 of the 14 parcels from which the 16 sales were made in 1955 and 1956 were acquired between 1918 and 1927 in connection with Grassmann's purchasing activities on behalf of Central Railroad and another industrial company. Of the remaining 8 parcels, 1 had been purchased in 1917, 1 in 1921, 1 sometime in the 1920's and 5 between 1948 and 1954. Petitioner further points to the circumstances of the sales of the properties *100 in question. Grassmann testified to the fact that some of the sales were made at the urging of local officials and some were made because taxes had increased in the area and petitioner decided that it could not profitably hold the property and longer. As we have set out in some detail in our findings, petitioner made some sales to purchasers which had previously bought land from petitioner. When these facts are considered in conjunction with the other facts of record, they are not persuasive that the real estate sold was not held by petitioner for sale to customers in the ordinary course of its trade or business. Petitioner's sales and purchases of real estate for many years were numerous and continuous. From 1940 to 1956 petitioner sold 297 parcels of real estate. Approximately 251 of these were located in subdivision tracts gains on which were reported as ordinary income. In the same period petitioner purchased 109 parcels. Of the 114 parcels purchased between 1932 and 1956 no more than 24 were for the purpose of clearing titles and straightening lines of properties. The others were for the purpose of reinvesting proceeds of involuntary conversions, part payment of the sales price *101 of new properties, and 26 outright new acquisitions. In 1955 and 1956 when petitioner made the sales, the treatment of which is here in issue, it sold 42 other parcels, the gain from which it reported as ordinary income. In the same 2-year period it purchased a total of 27 parcels. In addition petitioner's balance sheet showed an increase in cost or other basis for real estate from $583,499 on December 31, 1954 to $612,942 on December 31, 1955, to $621,503 on December 31, 1956. Respondent points out that even though petitioner had held many of the properties here involved for long periods that during the holding periods there was a continuous dealing in the tracts and that the consistent sales activity indicates that all during the period these properties were held they were held for sale to petitioner's customers in the ordinary course of its trade or business. Petitioner made three prior sales from the Port Avenue tract, two in 1932 and one in 1954 to the same purchaser. Petitioner made seven prior sales from the Fairmount Avenue and Woodruff Lane tract, one in 1927, two in 1932 and one in each of the years 1943, 1944, 1945, and 1952 to three separate purchasers. Petitioner made *102 seven prior sales from the Atlantic Street parcel in the period 1949 to 1952. Petitioner made four prior sales from the Meadow Street tract, one in 1950, one in 1952 and two in 1954. As set out in our finding, petitioner made two sales from this tract in 1956. Two of the four prior sales were made to one purchaser. Petitioner had made two prior sales from the property at Lower Road. Petitioner retains ownership in portions of four of the tracts involved in this proceeding. We think that this pattern of successive sales from the same parcels points to the conclusion that petitioner was holding the land for sale to customers in the ordinary course of its business. Petitioner points out that it did not develop or improve the properties from which sales were reported as capital gains. Petitioner also points out that it did not advertise its properties for sale. While it is true that petitioner did not conduct a campaign of active sales promotion of its properties, it is also true that petitioner was in a position to sell property without conducting a more usual sales program. Grassmann was very well known in local real estate circles. He was known as a result of his activities in purchasing *103 over $3,000,000 in land for Central Railroad and for other industrial clients as well as land on his own account. He received 200 to 300 inquiries a year from people who wished to buy real estate. Moreover, since Grassmann, or one of his corporations held so much land on behalf of others, many people came to purchase property after searching land records in the Elizabeth City office. Thus, the absence of advertising must be viewed in the context of this business enterprise. See Real Estate Corporation, 35 T.C. 610, 614 (1961) affd. 301 F. 2d 423 (C.A. 10, 1963) certiorari denied, 371 U.S. 822. The income realized from petitioner's real estate sales was substantial. During 1955 and 1956 petitioner was engaged in (1) road building equipment sales, (2) gas transmission sales, (3) aerial tramway design and sales, (4) metal mining prospecting and testing, (5) clay drilling and prospecting, (6) investment in clay lands and affiliated companies, and (7) real estate transactions. Approximately 36 percent of its reported taxable income for 1955 and 58 percent of its reported taxable income for 1956 were the results of real estate sales (including subdivision sales and the 16 sales here *104 in issue). Petitioner contends that the gains from real estate sales should be compared to gross income rather than taxable income and further that only the gains from real estate sales which were reported as capital gains should be compared to gross income and taxable income. We think that total real estate income as compared with taxable income is a more appropriate test. See Real Estate Corporation, supra. Cf. James G. Hoover, 32 T.C. 618 (1959). Petitioner contends that it has been held that property sold was not held by a taxpayer for sale to customers in the ordinary course of its trade or business in a number of cases which showed greater frequency and number of sales than exist in the instant case. Berberovich v. Menninger, 147 F. Supp. 890 (E.D. Mich. 1957); Consolidated Naval Stores v. Fahs, 227 F. 2d 923 (C.A. 5, 1955); Harcum v. United States, 164 F. Supp. 650 (1958) (E.D. Va. 1958); Frieda E. J. Farley, 7 T.C. 198 (1946). These cases are all unlike the instant case because either (1) the taxpayer was selling his real estate holdings because the property was no longer fit for the purpose for which it was acquired, or (2) the owner was unable to use it for the purpose *105 for which it was acquired. In the instant case petitioner was buying additional property while selling old property and in fact increasing the total cost or other basis of its real estate. This fact indicates a business of buying and selling, not the liquidation of an investment. Considering the entire record, we hold that petitioner held the properties sold in 1955 and 1956 except 447-459 Trinity Place and 512 Westminster Avenue primarily for sale to customers in the ordinary course of its trade or business and the gains on the sales of the properties so held are ordinary income to petitioner. Bad Debt Issue Section 166 [2] of the Internal Revenue Code of 1954 provides for the deduction of any debt which becomes worthless within the taxable year. In the instant case the parties agree that there was a bona fide debt running from Braillard to petitioner of $3,837.80. The only issue is whether this debt became worthless in the year 1955. In 1955 the debt had been due for 6 years and the statutory period of limitation *106 in New Jersey[3] expired. The running of the statutory period of limitations is not the sole factor in determining whether a debt is worthless or the year in which it becomes worthless. This factor is nevertheless one to be considered. In 1955 the debtor had been seriously ill for some time and had informed Grassmann that he was unable to pay his debt as a result of his inability to work. Grassmann made inquiries in the small town where Braillard had lived for several years and had been publishing a small newspaper. He learned that Braillard was deeply in debt and unable to pay his bills. Grassmann was advised by petitioner's attorney that to establish the debt and its worthlessness in 1955 for tax purposes, it was desirable to file suit and obtain a judgment. Grassmann did not have petitioner take such action because Grassmann feared that Braillard's physical condition was so serious that a legal proceeding of this kind might lead to Braillard's death. We conclude that petitioner was justified in determining the debt to be worthless in 1955, relying upon Grassmann's personal familiarity with Braillard's health (see Motter v. Smyth, 77 F. 2d 77 (C.A. 10, 1935)) *107 business activities, financial circumstances, and reputation for personal integrity. From the information practically obtainable and in the light of the surrounding circumstances, sound business judgment indicates Braillard's debt to petitioner to have become worthless in 1955. John E. Sadler, 2 B.T.A. 1305 (1925); Howard McCutcheon, 18 B.T.A. 834, 838 (1930). We sustain petitioner in its claimed deduction in 1955 for a bad debt in the amount of $3,837.80. Decision will be entered under Rule 50. Footnotes
1. Petitioner was incorporated in 1932. Dates shown as the year the properties were acquired are the dates such properties were acquired by petitioner's predecessors, Buffalo Construction Company, Consolidated Corporation, and Grassmann in his individual capacity. These properties were held continuously by petitioner and its predecessors. ↩
2. Reported by petitioner on its Federal income tax returns as capital gain transactions, the correctness of which is now being contested in this proceeding. The profits from the balance of the sales were reported as ordinary income.↩
*. In 1955 of the total reported gain the amount reported as long-term capital gain was $89,050.90 and as ordinary income $59,421.11. The similar amounts for 1956 were $127,060.22 and $74,591.77, respectively. Included in both the total reported real estate income of $201,651.99 for 1956 and the reported long-term capital gains of $127,060.22 are two items totaling $7,914.31 that appear to be dividends and not gains from sales of real property. Petitioner's correct total gains from sales of real property are $193,737.68 and the correct total gains from the 10 properties here in issue are $119,148.91.↩
1. Sec. 1221, I.R.C. 1954. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩
2. Sec. 166, I.R.C. 1954. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year.↩
3. N.J.S.A. 2A↩: 14-1.