**REAL ESTATE CORPORATION, Inc.,**
**Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REV-**
**ENUE, Respondent.**

**No. 6824.**

United States Court of Appeals
Tenth Circuit.

March 1, 1962.

As Corrected on Denial of Rehearing
April 23, 1962.

4. New York Stock Corporation Law, § 16.

**424**

N. E. Snyder, Kansas City, Kan., for petitioner.

Thomas H. McPeters, Washington, D. C. (John B. Jones, Jr., Acting Atty. Gen., Lee A. Jackson and Harold C. Wilkenfeld, Dept. of Justice, Washington, D. C., were with him on the brief), for respondent.

Before HUXMAN and LEWIS, Circuit Judges, and RICE, District Judge.

HUXMAN, Circuit Judge.

This is an appeal from the decision of the Tax Court, holding first, that with respect to the income involved for the years in question petitioner was engaged in the business of buying and selling real estate in the ordinary course of business and not for investment purposes, and therefore, the income was taxable as ordinary income under Sections 117(a) (1) (A) and 117(j) (1) of the Internal Revenue Code of 1939, 26 U.S. C.A. § 117(a) (1) (A), (j) (1); and second, that petitioner was not entitled to postpone recognition of the gain realized from the sale of 77 lots to the Union Pacific Railroad Company in 1952 under provisions of Section 112(f) of the 1939 Code, 26 U.S.C.A. § 112(f). Based upon these conclusions, additional income taxes for the years in question were assessed.

A detailed statement of how petitioner came to be is necessary to understand the problems presented. The Riverview State Bank, a Kansas corporation,[1] is forbidden by Kansas law to hold or own real estate. The City of Kansas City, Kansas, paid for certain public improvements by issuing and delivering to contractors tax bills which they in turn sold to purchasers to obtain money to finance their operations. These tax bills became a lien on the property which was subject to assessment for taxes. If the taxes were not paid, the property was sold for taxes. The bank purchased several hundred thousand dollars worth of these tax bills. When owners of tracts of land failed to pay the taxes levied against their property, the land was sold at tax sale and to protect its investment in these tax bills, the bank was forced to purchase the land at such sales. The state and federal bank examiners objected to these purchases of land. To divest itself of these holdings, the bank formed a wholly-owned subsidiary corporation, the General Securities Corporation, to hold these certificates and lands. The bank examiners objected to this arrangement, whereupon, considerable persons, with one exception stockholders in the bank, organized petitioner, the Real Estate Corporation, Inc.[2] to hold these assets. The corporation purchased all the assets of the General Securities Corporation, giving its note in the amount of $23,944.02. The number of lots thus acquired was between one thousand and two thousand. For the years, 1949 through 1952, the corporation's activities in the purchase and sale of these lots were as follows:

---

1. Herein called the Bank.

2. Herein called the corporation.

| | Purchases | | Sales | | | | Sales Proceeds as Percentage of Gross Receipts | Net Income from Realty Sales As Percentage of Total Net Income |
|---|---|---|---|---|---|---|---|---|
| Year | Lots | Transactions | Lots | Transactions | Sales Proceeds | Other Receipts | | |
| 1949 | 44 | * | 62** | 18 | $21,672.50 | $ * | * | * |
| 1950 | 80 | 9 | 32*** | 18**** | 22,050.00 | 32,252.91 | 40.6 | 82.5 |
| 1951 | 24 | 6 | 63*** | 14 | 18,254.88 | 41,570.48 | 30.5 | 61.6 |
| 1952 | 9 | 3 | 117 | 20**** | 57,190.98 | 56,038.09 | 50.5 | 84.4 |
| 1953 | 9 | 4 | 52 | 18**** | 17,333.33 | 59,944.92 | 22.0 | 31.8 |
| 1954 | 21 | 13 | 28** | 6 | 20,311.85 | 53,793.39 | 27.0 | 33.3 |

* Not shown
** Plus tracts of various sizes.
*** Excludes condemnations by the city.

These were all vacant lots and were scattered generally throughout the city.

In carrying on its activities, the corporation maintained no separate offices, but used the address and place of business of the bank. It paid no salaries, no rent, no dividends and maintained no listing in any telephone directory or in the Polk City Directory. It was not licensed as a real estate broker or agent. It did no soliciting of customers by newspaper advertisement, posting hand bills or "for sale" signs erected on the lots. Purchasers usually came to the corporation after searching the tax records at the courthouse. During the years in question, the purchasers were frequently customers of the bank or adjoining landowners. When customers came to inquire about purchasing these lots, the corporation frequently made efforts to lease them but when unable to do so, sold them instead.

The corporation was formed to protect the bank's investments and to accumulate income from investments. Its ordinary income was expected to be lease rentals, the primary purpose at acquisition of a property was to hold the real estate for its investment opportunities and advantages. Some of the proceeds from sales have been reinvested in other properties purchased at tax sales. Between ten and twenty of the unimproved properties acquired at tax sales have been leased for billboards and gardens. No parcels acquired at a tax sale have been improved by petitioner. Its improved and leased parcels were separated on its books from the unimproved property purchased at tax sales. The improved properties were acquired privately and were leased. The corporation has lost some parcels by failure to pay taxes, pursuant to a policy of not paying taxes on property it felt it could not lease and on which it felt it had made a bad investment. The corporation's income was expected to be, and in fact was, insufficient to pay the taxes on all of its land if all of it had been retained.

In 1952, the Union Pacific Railroad planned to expand its addition in Kansas City, Kansas. This being a public improvement, the Union Pacific had power to acquire property therefor under its power of eminent domain. It wanted some of these vacant lots owned by the corporation and before commencing condemnation proceedings, negotiated a sale of 77 lots to Union Pacific for a price of $30,878.48. Petitioner was unable to reinvest these proceeds at tax sales of unimproved lots. In 1952, approximately $27,000 of the proceeds realized from the sale of these lots to the Union Pacific was invested in stocks of the First National Bank, which stock was sold in 1955 to the corporation's president.

On December 31, 1953, the petitioner mailed a partially completed Treasury Form 1114, "Application To Establish A Replacement Fund," to the District Director of Internal Revenue, Wichita, Kansas, which was received in the office on January 4, 1954. This form requires the applicant to proceed as expeditiously as possible to restore the property condemned. The Commissioner took no action on petitioner's application.

In its original 1952 income tax return, petitioner elected to recognize the gain from the sale to the Union Pacific but thereafter on January 15, 1953, it filed an amended return based on nonrecognition of the gain and took credit thereon for its alleged overpayment of the first installment due under its original return.

Based upon these findings, the Tax Court concluded that the corporation was engaged in the business of holding real estate for investment purposes and that it was also engaged in a second business of holding unimproved land primarily for sale to customers in the ordinary course of business.

The corporation challenges the findings of the Tax Court and the judgment based thereon on the ground that there is no substantial evidence in the record supporting its conclusions. The answer to this question must be found in the peculiar facts of this case and since the facts in no two cases are identical, decisions in other cases are not con-

trolling, although they may throw light on our problem. Therefore, no attempt will be made to analyze and distinguish these numerous decisions.

The principles of law which control are clear and not in conflict. All decisions recognize that the capital gain provision of the Revenue Law was passed for a special group of taxpayers. It was passed to relieve a taxpayer from excessive tax burdens resulting from those situations where property had been purchased for an investment, had been held for a long period of time and had greatly appreciated in value. Congress intended to give a taxpayer relief from the tax burden which would result if he were required to report the appreciated value over a long period of time as ordinary income in the year the capital asset was liquidated. Being an exception to the general rule of taxation, the provision must be narrowly construed and one who seeks the benefits of its provision must bring himself strictly within the terms of the exception.[3] If the findings of the Tax Court find support in the record, we may not reverse because we, in the first instance, might have reached a different conclusion.

Petitioner stresses the decisions of many courts including this court,[4] emphasizing the presence or absence of certain factors in support of their conclusions that a certain taxpayer was or was not engaged in the purchase and sale of real estate in the ordinary course of business. The most common of these factors are holding a real estate license, advertising sales campaign, telephone listings as a realtor, for sale signs placed on a property, personal solicitations, etc. The corporation stresses our decision in Victory Housing Unit No. 2, supra, emphasizing the absence of these factors but in that case we were careful to point out that "none of them are determinative. Neither is the presence nor the absence of any of these factors [controlling]." It was pointed out in that case that if one holding a number of capital assets decides to liquidate them, "it could sell them in any way most advantageous to it" so long as it did not enter the real estate business. We know of no reason, in law, why one desiring to dispose of capital assets might not do so in the same way he would dispose of real estate sold in the ordinary course of business. So long as he confined his efforts to liquidating the capital assets, he would not be engaged in the ordinary real estate business no matter in what manner he sold such assets.

But the corporation's status here is not such that we must say, as a matter of fact, that it was not engaged in the purchase and sale of real estate in the ordinary course of business. At the beginning, all of the assets which resulted in a requirement that the bank divest itself of these holdings were tax certificates. When this real estate was purchased to protect the bank's investment in these certificates, whether such real estate thereafter became a capital asset depended upon how the bank and its successor corporation chose to treat them. Significant is the fact that the corporation in each year in question continued to buy and sell these vacant scattered lots of small value. It kept them separated on its books from capital assets producing income. It made no effort to improve them so the real estate would produce rental income. The rental income from the investment property was insufficient to maintain the financial integrity of the corporation. Whether we consider gross or net income, a very considerable percent of the corporation's income came from the sale of these lots. Because of its relationship to and contact with the bank, it had quite a steady flow of prospective purchasers without the necessity of carrying on a sales campaign.

---

3. Commissioner v. P. G. Lake, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743.

4. See Victory Housing No. 2 v. Commissioner, 10 Cir., 205 F.2d 371; Mauldin v. Commissioner, 10 Cir., 195 F.2d 714.

■ The corporation emphasizes the fact that it paid no salary and declared no dividends and that the officers devoted but little time to the affairs of the corporation. But the fact remains they devoted sufficient time to its affairs to locate these lots, purchase them at foreclosure sales and negotiate and complete sales thereof in considerable number in each of the years in question. We feel that the Tax Court's conclusions that the corporation was engaged in a second business of buying and selling these vacant lots in the ordinary course of business finds support in the record.

■ A second issue presented is whether the Tax Court erred in denying postponement of the gain of $30,878.48 realized from the involuntary conversion of the 77 lots sold by the Union Pacific in 1952. Under Section 112(f) (3) of the Code, any gain realized from an involuntary sale occurring after December 31, 1950, may be postponed at the election of the taxpayer, provided taxpayer (1) replaces the property with similar property within one year after the close of the first taxable year in which any part of the gain was realized, or (2) procures an extension of time for its replacement.

No application for extension of time was ever filed. However on December 31, 1953, a partially completed Treasury Form 1114, "Application To Establish A Replacement Fund" was mailed to the District Director of Internal Revenue, Wichita, Kansas. The application was received at the District Director's office January 4, 1954. Section 112(f) (3) of the 1939 Code, applicable to conversions occurring after December 31, 1950, has no provision for the establishment of a replacement fund. The corporation was therefore not entitled to the establishment of such a fund.

The Tax Court, however, treated the application as one for extension of time to replace the property under Section 112(f) (3) but held that so treated, the application was insufficient because not filed in time and because it did not comply with the regulations with respect to filing a qualified bond.[5] The bond filed with the application was only partially completed and did not purport to be executed by a qualified surety company as required by Regulation 118. The time for filing an application for extension of time expired December 31, 1953. The application was deposited in the mail on December 31, 1953, but was not received at the Director's office until January 4, 1954. The corporation relies upon 26 U.S.C.A. § 7502 in support of its contention that the date of the postmark on the envelope shall be deemed the date of delivery.[6] However, Section 7851(a) (6) (A) and (C) (v) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7851(a) (6) (A), (C) (v) expressly provides that with respect to the 1939 Code, Section 7502 shall apply only if the mailing occurs after the date of the enactment of

5. Treasury Regulation 118–39.112(f)—1 (c) (3), provides that:

"Such application shall be made prior to the expiration of the one year after the close of the first taxable year in which any part of the gain upon the conversion is realized. * * * No extension of time shall be granted pursuant to such an application unless the taxpayer executes a bond, with such surety as the Commissioner may require, * *. Only surety companies holding certificates of authority from the Secretary of the Treasury as acceptable sureties on Federal bonds will be approved as sureties. * * *"

6. 26 U.S.C.A. § 7502, in part, provides that:

"This subsection shall apply only if the postmark date falls within the prescribed period or on or before the prescribed date for the filing of the claim, statement, or other document, determined with regard to any extension granted for such filing, and only if the claim, statement, or other document was, within the prescribed time, deposited in the mail in the United States in an envelope or other appropriate wrapper, postage prepaid, properly addressed to the agency, office, or officer with which the claim, statement, or other document is required to be filed."

this Act.[7] Thus Section 7851(a) (6) (A) and (C) (v), and the pertinent part of Regulation 118, sustains the Tax Court's finding that no proper application for extension of time to establish a replacement fund was timely filed. Since no such application was filed, the corporation was not entitled to postpone the income realized in 1952 from the sale of these 77 lots.

Affirmed.

7. "(v) Chapter 77, relating to miscellaneous provisions, except that section 7502 shall apply only if the mailing occurs after the date of enactment of this title, and section 7503 shall apply only if the last date referred to therein occurs after the date of enactment of this title."