Victor Lee COFFEY, Sr., and Margaret
H. Coffey, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 7422.

United States Court of Appeals
Tenth Circuit.

May 15, 1964.

Rehearing Denied Aug. 19, 1964.

Gene W. Reardon, Denver, Colo. (Julie M. Reardon, Denver, Colo., on the brief), for appellants.

Benjamin M. Parker, Attorney, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attorneys, Dept. of Justice, Washington, D. C., and Lawrence M. Henry, U. S. Atty., Denver, Colo., on the brief), for appellee.

Before MURRAH, Chief Judge, and PICKETT and LEWIS, Circuit Judges.

PICKETT, Circuit Judge.

The principal question presented by this appeal is whether gains accruing to the appellants-taxpayers from sales of real estate and water stock during the years 1952 through 1955 should be taxed as ordinary income or as income from the sale of capital assets.[1] In their returns for these years, the taxpayers returned the gain as income from the sale of capital assets. The Commissioner determined that the property was held for sale to customers in the ordinary course of trade or business, and should be taxed as ordinary income. Accordingly, a deficiency was assessed, which was paid and a claim for refund filed. The refund was denied and this action was brought and tried before a jury. The trial court submitted to the jury the question of whether the properties from which the taxpayers derived the income in question through sales, were held "primarily for sale to customers in the ordinary course of business." The jury answered the question in the affirmative, and judgment in favor of the United States was entered thereon. The taxpayers contend that there is no evidentiary basis for the verdict, and that their motion for a directed verdict, made at the close of all the evidence, should have been sustained.

The law applicable to cases of this kind is well established and is as expressed in Friend v. Commissioner, 10 Cir., 198 F.2d 285, 287, 46 A.L.R.2d 761, where this court said:

"Under the terms of section 117 of the Internal Revenue Code, 26 U.S.C. § 117, a taxpayer is entitled to preferential treatment of gain derived from the sale or disposition of a capital asset, but the statute expressly excludes from its scope gain derived from the sale or disposition of property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. No fixed formula or rule of thumb has been evolved for ready use in determining in every case whether property sold by a taxpayer was held by him primarily for sale to customers in the ordinary course of his trade or business. Each case must turn upon its own facts and circumstances. But certain factors have been laid down as helpful guides for appropriate consideration in reaching a correct solution of the question. Among such factors are the purposes for which the property was acquired; the activities of the taxpayer and those acting in his behalf or under his direction, such as making improvements or advertising the property to attract purchasers; the continuity and frequency of sales as distinguished from isolated transactions; and any other fact which tends to indicate whether the sale or transaction was in furtherance of an occupation of the taxpayer. Mauldin v. Commissioner,

1. 26 U.S.C. § 1221, reads:

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *"

10 Cir., 195 F.2d 714; Dunlap v. Oldham Lumber Co., 5 Cir., 178 F. 2d 781; Rollingwood Corp. v. Commissioner, 9 Cir., 190 F.2d 263.

"It is the well settled rule that whether property sold or otherwise disposed of by a taxpayer was held by him for sale to customers in the ordinary course of his trade or business, within the meaning of section 117, is essentially a question of fact. Rubino v. Commissioner, 9 Cir., 186 F.2d 304, certiorari denied, 342 U. S. 814, 72 S.Ct. 28, [96 L.Ed. 615]; King v. Commissioner, 5 Cir., 189 F. 2d 122, certiorari denied, 342 U.S. 829, 72 S.Ct. 54, [96 L.Ed. 627]; Mauldin v. Commissioner, supra. It is the function of the Tax Court to weigh evidence, draw inferences, resolve conflicts, and determine facts. And a finding of fact made by that Court will not be disturbed on review if it is sustained by substantial evidence and is not clearly wrong. Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L. Ed. 1346; Commissioner of Internal Revenue v. Scottish American Investment Co., 323 U.S. 119, 65 S. Ct. 169, 89 L.Ed. 113."

See also Victory Housing No. 2 v. C.I.R., 10 Cir., 205 F.2d 371; Di Lisio v. Vidal, 10 Cir., 233 F.2d 909; Real Estate Corp. v. C.I.R., 10 Cir., 301 F.2d 423, cert. denied 371 U.S. 822, 83 S.Ct. 37, 9 L.Ed. 2d 61, reh. denied 371 U.S. 917, 83 S. Ct. 252, 9 L.Ed.2d 176.

In Real Estate Corp. v. C.I.R., supra, 301 F.2d at 427, it was said:

"Petitioner stresses the decisions of many courts including this court, emphasizing the presence or absence of certain factors in support of their conclusions that a certain taxpayer was or was not engaged in the purchase and sale of real estate in the ordinary course of business. The most common of these factors are holding real estate license, advertising sales campaign, telephone listings as a realtor, for sale signs placed on a property, personal solicitations, etc. The corporation stresses our decision in Victory Housing Unit No. 2, supra, emphasizing the absence of these factors but in that case we were careful to point out that 'none of them are determinative. Neither is the presence nor the absence of any of these factors [controlling].' * * * "

Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743, rehearing denied 356 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1071, is to the same effect.

■ The record discloses these facts: For many years the taxpayers had been in the restaurant business. In 1947 this business was sold, and Victor Coffee, who was then 53 years old, testified that after the sale, he and his wife "just retired" and that he was not thereafter engaged in any business. However, during the period 1947 through 1955, he and Mrs. Coffee were participating in a variety of real estate transactions[2] in the Denver, Colorado area. In December of 1950, the taxpayers joined with Thomas Nevin, (a Denver lawyer and brother of the taxpayer Margaret Coffee), and others, in the purchase of 140 acres of land and water stock from the Colorado National Bank. At about the same time the taxpayers, with Nevin

2. After admitting that he had made numerous purchases and sales of real estate in the years 1947, 1948 and 1949, Victor Coffee testified:
"Q. Now before we went through all of these, Mr. Coffee, I asked you if in addition to the real estate involved in the case that we have here, whether or not you had dealt in other real estate, and I think you said 'No, except for three rental pieces that' you received. A. Yes.
"Q. Now just so the record will be clear, do you now recall that there were more such real estate transactions? A. Yes, you recalled it back.
"Q. So you were in error when you said that before? A. Yes, I was.
"Q. Now, in addition to those properties, during the year 1952, did you own any

and Frederick Kal, a practicing lawyer associated with Nevin, purchased two other tracts, one of 80 acres and the other of 68.88 acres, together with water stock. All of these properties were unimproved and were acquired for the purpose of immediate sale to Artcraft Builders of New Mexico. After default by Artcraft, the taxpayers and Nevin, in 1952, again became the record owners of 100 acres of the Colorado National Bank land, of which the taxpayers owned an undivided two-thirds interest. Artcraft also defaulted as to the 68.88 acre tract and 40 acres of the 80 acre tract, and the taxpayers, Nevin and Kal again became the owners of this land and the water stock. Except for some platting by Artcraft, the character of these tracts after default by Artcraft was essentially the same as when acquired by taxpayers and others. During the period when these properties were being acquired, Nevin Homes, Inc., a Colorado corporation, was created, with the taxpayers owning 50% of the stock and Nevin and Kal owning the remaining 50%. This corporation purchased 40 acres of land adjacent to the 80 acre tract and constructed homes thereon for sale. As treasurer, Victor Coffee was paid an annual salary of $5,000.00.

█ The original purchase agreement of the 80 acre tract recited that the purchase was for the purpose of building two and three bedroom houses thereon to be sold to the public or to veterans, and it was agreed that Artcraft was to be bound by this provision. During this time there was considerable development in the area adjoining this property.[3] In July of 1952 the taxpayers and Nevin signed the final plan of subdivision of Mar-Lee Manor No. 2, which was approved by officials of the City and County of Denver. This subdivision included land acquired from the Colorado National Bank. Shortly thereafter the taxpayers joined in a conveyance which, by lot and block numbers, transferred a portion of this subdivision to a life insurance company pursuant to a contract entered into about June of 1952. In 1953 additional lots in Mar-Lee Manor No. 2 were sold to a Mr. Bennett and a Mr. English. In 1953 the Nevin Construction Company, a Colorado corporation, owned entirely by Nevin and Kal, contracted to purchase from taxpayers and Nevin property in Mar-Lee Manor No. 2, and to purchase from taxpayers, Nevin and Kal property in the other two tracts, all of which totaled 79.29 acres. Nevin testified that this land, the purchase price of which was in excess of $200,000.00, was to be paid for "as Nevin Construction Company developed and sold the property." In 1952 the water stock

vacant lots which were Lots 29, 30, 31 and 32, Block 86, Burkley subdivision? A. How many lots?

"Q. Lots 29, 30, 31 and 32, Block 86, Burkley subdivision? Do you remember owning those? A. I owned those—I think they had been on Federal, if I'm not mistaken.

"Q. Do you recall owning vacant lots 11, 12, 13, 14, 15, 16, 17 and 18 in Block 10 in Cheltenham Heights, Widamoore addition, do you remember that? A. Yes.

"Q. That was the property that you had purchased at the tax sales, was it not? A. Pardon me?

"Q. That was the property you had purchased at these tax sales, wasn't it? A. We purchased some. I think that might have been it.

"Q. Now, during the year 1952, did you also own vacant lots 21, 23, 8, 10, 5, 6, 7, 14, 4, 6, and 18 in Block 14 and 10, 9, 14, 15, 4, 7, and 11 of Glen Heights, Jefferson County? A. Yes.

"Q. Twelve separate sites? A. Yes.

"Q. Now, when I asked you before where you had purchased those—A. I forgot—

"Q. You forgot all about those? A. Yes.

"Q. Now, do you recall now, Mr. Coffey, that you continued to own these different properties throughout 1952 and '55? A. Yes.

"Q. Did you sell any of them? A. Sir?

"Q. Did you sell any of those properties? A. We sold—seems like—three or four on Glen Heights, as I recall."

3. Nevin testified that Artcraft built 192 homes and Axsel Nielson built 80 acres of homes on adjoining land.

acquired with the Colorado National Bank purchase was sold at a profit to Adolph Coors Brewing Company. In November, 1952, the taxpayers and Nevin sold 53 acres of the land returned from the Artcraft deal for $147,700.00, to J. O. Stevens, an accountant who officed with Nevin and was the accountant for the group. The other sales involved in this case were 6 acres to Denver Public Schools in 1952, 1.1 acres to Bennett and English in 1953, 7.46 acres to Burns Realty & Trust Co. in 1954, together with water stock, and 1.04 acres to M. J. Frederics & Co. in 1955. There was evidence of other sales during this period which created no tax dispute. The taxpayers testified that they were not engaged in any business as of the time of filing their income tax returns, yet they claimed certain business expense deductions such as an "auto 90% used in business", and depreciation on a truck. Considering the evidence most favorable to the appellee, as we must,[4] it is sufficient to support the verdict.

The taxpayers also contend that their motion for a new trial should have been granted because of prejudicial errors in the trial proceedings. The pre-trial order included a list of witnesses the parties expected to call during the trial. It provided that "either party may call witnesses not named above and shall advise the other party" on or before a stated date, of the names and addresses of the additional witnesses, together with a statement of the substance of their testimony. The order also required that the parties advise each other and the court on or before a certain date of the exhibits intended to be offered at the trial. The United States produced at the trial and had marked for identification a number of exhibits relating to real estate transactions of the taxpayers. These exhibits had not been submitted as required by the pre-trial order. The taxpayers denied that they were in the real estate business, and some of these exhibits were used for impeachment purposes. Their use was within the discretion of the trial court even though they were not produced prior to the trial as contemplated by the pre-trial order. Hoeppner Constr. Co. v. United States, 10 Cir., 287 F.2d 108; Globe Cereal Mills v. Scrivener, 10 Cir., 240 F.2d 330. We find no abuse of discretion.

The taxpayers assign numerous other errors which they urge deprived them of a fair trial. These alleged errors relate to the use of the Internal Revenue Service's summons directed to Denver banks prior to trial;[5] failure to connect irrelevant evidence; prejudicial remarks of United States counsel in closing argument;[6] and erroneous cross-examination of some of taxpayers' witnesses, with unfair references to the taxpayers as being members of a joint adventure. We have given consideration to these alleged errors and find them to be without merit. Furthermore, motions for new trial are directed to the sound judicial discretion of the trial judge which will be reviewed on appeal only in cases of clear abuse of such discretion. Kansas City Public Service Co. v. Shephard, 10 Cir., 184 F.2d 945; Walter v. Warner, 10 Cir., 298 F.2d 481; Missouri, K. & T. Ry. Co. v. Jackson, 10 Cir., 174 F.2d 297.

We have considered the record in the light of the motion for costs and find that the appellee's counter-designation of portions thereof was necessary for the disposition of this case. The motion is therefore sustained, and all costs are assessed against the appellant.

Affirmed.

---

4. Garland Coal & Mining Co. v. Few, 10 Cir., 267 F.2d 785; Millers National Ins. Co. v. Wichita Flour Mills Co., 10 Cir., 257 F.2d 93, 76 A.L.R.2d 385.

5. The information sought by the procedure was certain bank accounts which might have some relation to transactions of the taxpayers. Whatever information was obtained was not offered in evidence.

6. No objections were made to these remarks except on motion for new trial.