Ben I. Seldin and Bertha J. Seldin v. Commissioner. Millard R. Seldin and Beverly Seldin v. Commissioner.
Seldin v. Commissioner
Docket Nos. 4213-66, 4218-66.
United States Tax Court
T.C. Memo 1969-233; 1969 Tax Ct. Memo LEXIS 63; 28 T.C.M. (CCH) 1215; T.C.M. (RIA) 69233; November 3, 1969. Filed David E. Pavel, 300 Continental Bldg., Omaha, Neb., for the petitioners. Ronald M. Frykberg, for the respondent. FAY
Revised Opinion from Order 29 CCH Tax Ct Memo 46. Memorandum Findings of Fact and Opinion FAY, Judge: Respondent initially determined deficiencies in petitioners' Federal income taxes for the calendar years 1960, 1961, and 1962, in the following amounts: Docket No.
Petitioners
Year
Deficiency
4213-66
Ben I. and Bertha J. Seldin
1960
$15,494.18
1961
15,645.18
1962
16,278.68
4218-66
Millard R. and Beverly Seldin
1960
13,872.64
1961
14,535.01
1962
14,625.70
By an amendment to his answer, respondent redetermined the deficiences, a
4213-66
Ben I. and Bertha J. Seldin
1960
$17,219.18
1961
18,728.91
1962
19,632.51
4218-66
Millard R. and Beverly Seldin
1960
15,486.85
1961
17,439.97
1962
17,824.75
*64 Two issues remain for decision. The first issue is whether a partnership of which petitioners [1] were members held certain real estate primarily for sale to customers in the ordinary course of its trade or business. The second issue is whether the same partnership is entitled to a deduction under section 170[2] for conveyances of land to certain school districts. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Ben I. Seldin ("Ben") and Bertha J. Seldin are husband and wife. They resided in Council Bluffs, Iowa, on the date their petition in this case was filed. They filed joint Federal income tax returns for the calendar years 1960, 1961, and 1962 with the district director of internal revenue, Des Moines, Iowa. Millard R. Seldin ("Millard") *65 and Beverly Seldin are husband and wife. They resided in Omaha, Nebraska, on the date their petition in this case was filed. They filed joint Federal income tax returns for the calendar years 1960, 1961, and 1962 with the district director of internal revenue, Omaha, Nebraska. Millard is a son of Ben. Ben and Millard have been actively engaged in the real estate business. They are officers of certain family-controlled corporations which engage in development, construction, and sales activities. The activities of these corporations center principally around 810 acres in Omaha which the Seldin family had begun developing as a subdivision in 1958. Known as "Westwood Communities," the subdivision was advertised as "Omaha's first Master Planned area." A brochure stated: Here you'll find shopping, recreation and community facilities all advantageously placed in advance for better living. Here you'll find advance planning that protects the present and future property values of all homes. * * * 1217 A sketch in the brochure designated schools, swimming pools, churches, and commercial areas within Westwood Communities. During the taxable years in issue, Ben and Millard were the *66 sole partners in Seldin Investment Company ("the partnership"). The partners share profits and losses equally. The partnership keeps its books and records and files its income tax returns on an accrual method of accounting for calendar years. Partnership returns of income for the taxable years involved were filed with the district director of internal revenue, Des Moines, Iowa. The partnership holds some land for investment purposes. It owns about 200 apartment units at the intersection of Center Road and 114th Street in Omaha. At the southeastern corner of Center Road and 120th Street, the partnership owns commercial land on which there are office buildings and a gasoline station. Across the street at the southwestern corner of 120th Street and Center Road is a 35-acre tract purchased by the partnership in 1956. The tract is being developed as a shopping center. There are presently a Safeway supermarket, a discount drugstore, a drycleaner, and a restaurant. Farther west at the southeastern corner of Center Road and 132nd Street the partnership owns an undeveloped 18-acre tract zoned commercial. During the past 12 years the partnership has not engaged in the business of developing *67 residential homes. The shopping center at the southwestern corner of Center Road and 120th Street is part of the first tract of land purchased by the partnership in the Omaha area. The tract, platted as Westwood Heights, consisted of approximately 270 acres of raw farmland. Millard acquired the entire tract on behalf of the partnership because the sellers would neither fragment the tract to separate purchasers nor sell only a portion of the tract. The partnership was interested in holding for investment purposes certain limited parts of the tract. It desired the above-described corner at 120th and Center for development as a shopping center. In fact, the sales agreement stated that the agreement of the buyer to purchase was conditioned upon the city council of Omaha's rezoning such part of the tract to a "First Commercial zone." The partnership also intended to hold other parts of the tract for eventual sale at a profit as school sites. The partnership never intended to hold the major portion of the tract. Those portions which the partnership did not desire were sold at cost to various companies controlled by the Seldin family. Of immediate interest in the instant case is a 10-acre *68 triangular tract in the middle of the 270 acres. The partners intended to hold this triangular tract for eventual sale to the city of Omaha as a school site. Negotiations between officials of the Omaha school district and Millard, acting on behalf of the partnership, regarding acquisition of a permanent school site began in approximately July 1959. Millard offered to sell the 10-acre tract. The Omaha school superintendent raised the suggestion that the partnership donate rather than sell another tract zoned commercial, which the partnership held. In November 1959, an attorney for the partnership, John W. Delehant, informed the president of the Omaha school board that the partnership would donate the 10-acre tract as a school site. On December 15, 1959, the partnership made a formal written offer, as follows: Board of Education Omaha Public School District
3902 Davenport Street Omaha, Nebraska
In re: Lot 1, Block 26, Westwood
Heights, a Subdivision in Douglas County, Nebraska
Gentlemen: This supplements my prior correspondence with Mr. Hastings on November 30, copy of which is enclosed. I am attorney for Seldin Investment Co. which is the owner of the above property, *69 which lies in the approximate center of Westwood Heights. The Addition includes home sites for over 1200 families. Surveys of purchasers show that the average family has approximately two children of school age. Attached are several plats of the Westwood Heights Addition. The engineering firm of Henningson, Durham & Richardson has laid out Westwood Heights, and in both their preliminary and final plans, the above land has been designated as a school site. The land consists of approximately ten acres and has a value of approximately $75,000.00. The plat has been given approval by the Planning Board. My client offers to donate this site to the School District for school purposes upon the following terms: 1. My client will install, or cause to be installed, sewer, water, gas and paving upon the platted streets surrounding the property. At the time of installation, the School District will pay the pro-rata cost of such installations on a front-foot basis, 1218 except that payment of gas need be made to Metropolitan Utilities District only at the time of connection to the gas main. 2. In order to complete the final platting, the School District will sign the plat and dedication *70 as and when submitted by my clients. 3. The School District will pay the customary sewer use fee established by Sanitary and Improvement District No. 31, and the School District will do all on-site grading and improvement work. 4. The School District will make available not less than 25 per cent of the ground area for playground purposes for use of the general public. 5. Property will be deeded and the gifts will be effective approximately one-half in calendar 1959 and one-half in January of 1960. 6. My clients will procure a release of the existing mortgage against the tract without any cost to the School District not later than the date when the School District lets a construction contract for an elementary school on the site. 7. For a period of 25 years, the property shall be used only for school purposes or for public park and recreation purposes. May we please have your consideration and acceptance of this proposal prior to the end of this year, in order that we may complete the arrangements to make the gift before the end of 1959. Very truly yours, /s/ JOHN W. DELEHANT The school board did not accept the offer principally because the conditions relating to the *71 costs of paving and installation of utilities were unacceptable. Most of such costs were related to the southerly 200 feet of lot 1, block 26, which was a part of the 10-acre tract. The school board also found unacceptable the condition that 25 percent must be made available to the general public for playground purposes. On October 8, 1960, the partnership revised its offer to exclude the southerly 200-foot segment. It was proposed that the school board pay a maximum special assessment of $6,360 and the partnership would pay all assessments in excess of that amount. The Omaha school board still was dissatisfied with the layout of the 10-acre tract. It suggested that the street forming the northwesterly border of the tract be closed and lots across the street from the 10-acre tract be acquired to enlarge the school site. These lots were owned by Parkwood, Inc., one of the corporations controlled by the Seldin family. The partnership and the Omaha school district entered into an agreement on November 26, 1960, whereby the partnership agreed to donate the 10-acre tract except for the southerly 200 feet. A portion of the tract designated "Parcel A" was donated on December 13, 1960, and *72 another portion, designated "Parcel B," on January 2, 1961. Parcel A was about 3.9 acres and parcel B about 3.3 acres. The agreement of November 26, 1960, provided in part: 2. The Donor further agrees that it will erect a fence along the dividing line between Parcel B and the Swim Club site in order to prohibit vehicular traffic across said dividing line. Said fence shall be erected and maintained for a period of not less than 25 years from date hereof by the owner of Swim Club site. The partnership engaged the services of Real Estate Research Corporation to appraise the two parcels of land donated to the Omaha school board. Joseph Kirshenbaum ("Kirshenbaum"), a qualified real estate appraiser who is well acquainted with the fair market value of land in and around Omaha, made the appraisals. While making his evaluations, Kirshenbaum considered comparable sales, rapid growth of the area encompassing the tract, and that the best use of the site was for finished lots in lieu of acreage sites. Considering the development and construction occurring in the area, he concluded that the tract should not be valued as raw farmland. More specifically, Kirshenbaum noted that there were between *73 350 and 400 homes built within the general area of the school site at the date of the donation. Streets were also being constructed throughout the general area. His opinion was that the fair market values of the parcels donated in 1960 and 1961 were $39,300 and $39,500, respectively. On November 29, 1960, the Omaha school district purchased 20 lots in block 27, Westwood Heights, from Parkwood, Inc., for a total consideration of $42,514. The selling price was computed by valuing the lots on the basis of $53 per front foot for improved lots and $35 a front foot for unimproved lots. The total amount at which the 20 lots were valued approximated $55,000 since there were 12 improved and 8 unimproved lots, each lot having a front footage of about 60 feet. From the total of $55,000 there was deducted $7,000 to offset the value of the aforementioned southerly 200 feet of the triangular tract in block 26 which the partnership retained. Another $5,500 was deducted as a cash discount. 1219 Theodore R. Seldin ("Ted") is a brother of Millard. Together with Ben and Millard, he is an officer and director of Seldin Realty Company. On behalf of the partnership, he wrote the following letter *74 dated June 12, 1962: Millard School Board Millard Public Schools c/o Donald Stroh, Superintendent Millard, Nebraska
Gentlemen: Pursuant to our previous conversations, enclosed please find two documents in regard to the elementary grade school site in Westwood Heights Addition. In accordance with our understanding, please find a document dated June 11, 1962, offering to donate 18 lots to the School Board for school purposes. I believe the contents of the offer is self-explanatory. The second document is a Purchase Agreement, which has been executed by the Manager of Westwood Park, Millard Seldin, which sells to the School Board 18 additional lots. The price includes cost of grading of the site. We attach a cost estimate prepared by Gollehon & Schemmer, Inc., Consulting Engineers. The grading plan for this site was worked out by Mr. Schemmer and the architect for the Board, Donald Hollis. As will be recalled, our previous estimates of grading were considerably lower. But in any event, the price of these lots is the original quoted price of $20,225.00, which was our costs to January 31st, 1962. The grading expense will vary in accordance with the site plans. The grading *75 cost of $22,556.00 is based upon moving 105,755 cubic yards of dirt. This could vary if the plan was altered. By including this grading in the current work being done in the Addition, the cost per yard is lower than if it was done alone. We would be happy to discuss this matter further with the Board representatives at your convenience. Sincerely yours, SELDIN REALTY CO.
/s/ Ted M. Seldin Theodore M. Seldin On September 20, 1962, Royalwood Estates, Inc., acting as nominee for the partnership, transferred 18 lots to the school district of Millard pursuant to the offer described above. The entire parcel was acquired as a platted piece of ground, laid out in lots undeveloped as to utilities. It was the understanding of the school board of Millard that the partnership was donating 18 lots and a joint venture named Westwood Park Joint Venture in a separate transaction was selling the other 18 lots. Kirshenbaum rendered an appraisal of the 18 lots donated to the school district of Millard. He utilized the same facts and factors in valuing the 18 lots donated as he had previously utilized in valuing the parcels of land donated to the Omaha school district. Kirshenbaum determined *76 that the fair market value of the 18 lots was $41,000. Streets were constructed around the site and development was proceeding in the immediate area of the site. The selling price of the 18 lots sold to the Millard school district by the Weswood Park Joint Venture was $33,000. Also in issue are 16 lots each being 60 feet wide by approximately 285 feet deep which the partnership had held since the purchase of the original 270-acre tract. The intention of the partnership regarding this land was to hold it for long-term investment. Sometime prior to May 26, 1960, the date on which the partnership filed a request for rezoning, plans had been drawn to build townhouse apartments on these lots. The apartments were to be held by the partnership for rental income. While the partnership originally intended to have such land zoned R-7, this classification was not acquired at the time of the original platting since the partnership did not have an immediate right to possession. The partners found that they had waited too long because the development companies had already sold a substantial number of homes in the area. Not surprisingly, residents objected before the planning board to rezoning *77 of the area for apartments, and the city planning board eventually recommended that only the first 165 feet lying south of Westwood Lane be zoned R-7 and that the balance be zoned R-5. The zoning ordinances, as finally passed, rezoned merely the north 165 feet of lots 1 and 35, block 1; lots 1 and 35, block 2; lots 1 and 24, block 3; and lots 1 and 28, block 4, to R-7 zoning. Since the entire 285 feet of the lots were needed, the apartment buildings contemplated on the lots could not be built. In view of the fact that the partnership was not in the residential development business, the land was sold to Seldin & Seldin, Inc., a construction company of which Ben and Millard were officers and directors. Sale was made to the construction company although titles to some lots passed directly to home buyers. Thus, the sale of the lots was due solely to 1220 an unexpected change in the partnership's original plans. There had been no purchase offers or purchase contracts or offers to sell any portion of such land prior to this time. The partnership was holding the 16 lots solely for investment purposes. As previously discussed, the southerly 200 feet of lot 1, block 26, were not *78 donated to the Omaha school district. Ted entered into negotiations with a community swim club association to arrange construction of a pool on this site. The partnership decided to sell the land to the Seldin Construction Company so that the latter could use its bank credit to finance construction of the pool. Seldin Construction Company sold the pool to the swim pool association at approximately its cost. On February 6, 1961, the Omaha school district sold to Parkwood, Inc., part of lot 2, block 26. Parkwood, Inc., resold this land to the partnership on the following day. On April 15, 1961, the partnership conveyed the parcel to Seldin Construction Company for use as a parking lot that would accommodate patrons of the swimming pool. The partnership realized a gain of $4,300 from the sale of the parcel out of lot 1, block 26, for the pool site and a gain of $115 on the part of lot 2, block 26, sold for use as a parking lot. On their Federal income tax returns for 1960 and 1961, Ben and Millard each deducted $19,650 and $19,750, respectively, as their distributive shares of the partnership's contribution deduction for conveyance of part of lot 1, block 26, to the Omaha school *79 district. On their Federal income tax returns for 1961, Ben and Millard each reported $57.50 short-term capital gain as their distributive shares of the partnership's gain on sale of the parcel from lot 2, block 26. On that same return they each reported as long-term capital gain their distributive shares of the partnership's gain on its sale of part of lot 1, block 26; and blocks 1, 2, 3, and 4. On their Federal income tax returns for 1962, Ben and Millard each deducted $20,500 as their distributive shares of the partnership's contribution deduction for conveyance of 18 lots to the Millard school district. In the statements attached to the statutory notices of deficiency, respondent stated that the conveyances to the Millard and Omaha school districts should be valued for purposes of the charitable contribution deduction at the cost of the land to the partnership rather than the fair market value of the land. Subsequently, in an amendment to his answer, respondent increased the deficiencies, alleging that the transfers of land do not qualify as charitable contributions. In the statements attached to the statutory notices of deficiency, respondent further stated that the gain *80 on the sales in 1961 referred to above should be reported as ordinary income rather than at capital gains rates. Opinion Two issues remain for decision by the Court. The first is whether the gains on certain sales of land by the partnership are taxable as capital gains or ordinary income. The second issue is whether certain transfers of land to school districts qualify as charitable contributions within the meaning of section 170. Regarding the first issue, we are concerned with three separate sales transactions. One sale consisted of 16 lots to a home construction company. In a second transaction, the partnership sold a parcel of land to a community swim club association. A third transaction related to the sale of a parcel adjoining the pool site for use as a parking lot. The taxability of the gains in question as capital gains or ordinary income depends upon whether the properties were held "primarily for sale to customers in the ordinary course of [a] trade or business." Section 1221(1), Internal Revenue Code of 1954. The word "primarily" should be construed *81 as meaning "of first importance" or "principally." Malat v. Riddell, 383 U.S. 569 (1966). The Supreme Court noted in Malat that the purpose of section 1221(1) is to differentiate between the profits and losses arising from the daily operation of a business on the one hand and the realization of appreciation in value accrued over a substantial period of time on the other. It is established that a person may be both a dealer and an investor in real estate. Charles E. Mieg, 32 T.C. 1314 (1959), acq. 1960-2 C.B. 6; Real Estate Corporation, 35 T.C. 610 (1961), affd. 301 F. 2d 423 (C.A. 10, 1962), certiorari denied 371 1221 U.S. 822 (1962). The reason is that a taxpayer's purpose for holding property may vary with respect to different tracts. His purpose or intention must be determined with respect to each tract. Municipal Bond Corporation v. Commissioner, 341 F. 2d 683 (C.A. 8, 1965), reversing on other grounds 41 T.C. 20 (1963). Therefore, in the immediate case we must look at each transaction *82 to determine the purpose for which the partnership held the property. Based upon an analysis of the entire record, we have concluded that the partnership held "primarily for sale" those parcels subsequently used as a pool site and adjoining parking lot. We think the petitioners as partners intended from the first stages of developing the subdivision to sell such land to a community association which would operate the pool. It is improbable that petitioners ever intended to operate the pool and the parking lot themselves. The selection of the particular site was made well in advance. A brochure advertised the subdivision as "Omaha's first Master Planned area." The brochure boasted: Here you'll find shopping, recreation and community facilities all advantageously placed in advance for better living. Here you'll find advance planning that protects the present and future property values of all homes. * * * A sketch of the subdivision in the brochure designated the location of the swimming pool. The intention of the partnership to later transfer these parcels as a site for a swimming pool club was expressed in an earlier agreement. The agreement related to the partnership's transfer *83 of an adjacent parcel to the school district of Omaha. The agreement provided: 2. The Donor further agrees that it will erect a fence along the dividing line between Parcel B and the Swim Club site in order to prohibit vehicular traffic across said dividing line. Said fence shall be erected and maintained for a period of not less than 25 years from the date hereof by the owner of Swim Club site. We reach a different result with respect to the gain on the sale of the 16 lots. We think the partnership always planned to build apartment townhouses thereon and to hold the property as an investment. We base this conclusion on the following facts: plans for construction of townhouse apartments had been drawn prior to the time rezoning was requested. The sale was precipitated by the city planning board's refusal to assign an R-7 zoning classification to a sufficient portion of the lots. After the refusal, it was no longer possible for the partnership to build the townhouse apartments. The partnership had not sought R-7 zoning when the tract was purchased and initially platted because the purchase agreement did not give the partnership an immediate right of possession. Following the vote *84 of the planning board, the only remaining use for the lots was for homesites. Since the partnership had never engaged in the residential development business, the land was sold to a construction company. The construction company which purchased the lots was owned by the Seldin family. Ben and Millard were officers and directors of the company. Nevertheless, we conclude that when the construction company later sold the lots it was not acting as an agent for the partnership. The partnership had a distinct modus operandi and the activities of the construction company should not be imputed to it. Compare Frank v. Commissioner, 321 F. 2d 143 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court. The Eighth Circuit imputed the security dealership activities of a corporation to the taxpayers, who were its officers and, for all practical purposes, its owners. The Court of Appeals emphasized that the taxpayers therein were selling securities in the corporation's name and were devoting substantially all of their time to its management. In contrast, the record in the case at bar reveals that Millard and Ben made a concerted effort to isolate their activities involving family-controlled *85 development companies from the inactive investment holdings of the partnership. The other issue for our decision is whether petitioners are entitled to charitable contribution deductions under section 170[3] 1222 resulting from the partnership's gratuitous conveyances of two parcels of land to the Millard and Omaha school districts, and if so, the amounts thereof. Respondent does not dispute that the school boards are organizations *86 referred to in section 170(c)(1) and that the donated tracts are to be used for exclusively public purposes within the meaning of the aforesaid subsection. In an amendment to his answer, respondent stated that the transfers of land to the school districts do not qualify as charitable "contributions" within the meaning of section 170. Respondent thus altered his prior position by totally disallowing petitioners' charitable contribution deductions rather than allowing the deductions at a value lower than claimed. As a result of the amendment to his answer, respondent has the burden of proof on the limited issue whether petitioners made a "contribution" under section 170. Relying upon section 1.170-1(c)(1) of his regulations, respondent has argued that petitioners' deductions should be limited to their cost bases. He reaches this conclusion on the grounds that when the partnership bought the overall tract it sold most of the acreage at cost to related development companies. We disagree with respondent's argument on two grounds. First, if the subdivided tracts had not been donated, they would have been sold voluntarily or involuntarily to the school districts. The sales would certainly *87 be based on the tracts' fair market values. Thus, the emphasized words in the following sentence of the regulations are inapplicable: If a donor makes a charitable contribution of, for example, stock in trade at a time when he could not reasonably have been expected to realize its usual selling price, the value of the gift is not the usual selling price but is the amount for which the quantity of merchandise contributed would have been sold by the donor at the time of the contribution. * * * Second, the regulation speaks of the amount which "the taxpayer would have received if he had sold the contributed property in the lowest usual market in which he customarily sells." It cannot be said in the instant case that petitioners ever engaged in any "customary" sales at cost. Those sales at cost involving most of the 270 acres, the fact upon which respondent relies, occurred only because the sellers insisted upon making the sale to a single purchaser, which was the partnership. In purchasing the 270 acres en masse and reselling the acreage in parcels to various related corporations, the partnership *88 was serving merely as a conduit. It is FURTHER ORDERED: Respondent's motion in regard to modification of the opinion concerning the charitable contribution issue "in accord with the contention of the respondent" is denied. Considering the evidence presented, we conclude that the partnership made "contributions" to the school districts of Millard and Omaha within the meaning of section 170. [4] Compare Sarah Marquis, 49 T.C. 695 (1968); Crosby Valve & Gage Company v. Commissioner, 380 F. 2d 146 (C.A. 1, 1967), affirming on other grounds 46 T.C. 641 (1966), certiorari denied 389 U.S. 976 (1967). [5] No statute or ordinance, state or local, of any kind compelled the partnership to donate the parcels to the school districts in order to secure approval from the city planning board of their subdivision. Compare Jordan Perlmutter, 45 T.C. 311, 317 (1965). This same land, however, is subject to the right of eminent domain under the law of the State of Nebraska. See section 79-4,107, Revised Statutes of Nebraska, 1943. *89 It can be said that the presence of the schools at the center of their subdivisions attracted some home buyers to the area and as a result enhanced the values of surrounding commercial properties which the partnership held. However, to hold for such reason alone the conveyances of the partnership were not "contributions" in these particular circumstances would stretch credulity. Compare Jordon Perlmutter, supra, and Sarah Marquis, supra, at 703. Furthermore, we would not disallow the deduction on the grounds that the partnership secured for its partners a greater after-tax benefit by casting the transaction as a donation rather than a sale. Crosby Valve & Gage Company v. Commissioner, supra; Julius H. (Groucho) Marx, 29 T.C. 88, 100 (1957), acq. 1958-2 C.B. 6. We must now determine the fair market values of the tracts contributed to the school districts of Omaha and Millard. The partnership donated approximately seven acres to the Omaha school district. The gift was made in two parts. Parcel A, consisting of about 3.9 acres, was transferred on December 13, 1960, while parcel B, consisting of about 3.3 acres, *90 was conveyed on January 2, 1961. On their Federal income tax returns for 1960 and 1961, Millard and Ben claimed charitable deductions based on the valuations of a qualified real estate appraiser, Kirshenbaum. His opinion was that the fair market values at the dates of the donations were $39,300 for parcel A and $39,500 for parcel B. We agree with Kirshenbaum's premise that the parcels should be valued as improved acreage rather than as raw farmland. The rapid development of the area and substantial demand for lots in the subdivision confirm his judgment. We do not agree, however, with the values which Kirshenbaum assigned to the parcels. He failed to make appropriate discounts for use of cash. More importantly, he failed to give adequate consideration to comparative sales of other lots. Kirshenbaum should have especially considered the aforementioned 20 lots sold by Parkwood, Inc., to the Omaha school district for $42,514. We have concluded that the values of parcels A and B were $33,000 and $32,000, respectively. Kirshenbaum appraised at $41,000 the 18 lots donated to the Millard school district. We have found the same weaknesses in his appraisal as we did with his earlier appraisals. *91 We conclude that these lots should be valued at $35,000. Decisions will be entered under Rule 50. 1223 Footnotes
1. The above-named women are petitioners solely because they filed joint Federal income tax returns with their husbands for the years in issue. Reference hereinafter to "petitioners" will be only to the husbands. ↩
2. All references herein to "section" will be to the Internal Revenue Code of 1954.↩
3. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction. (1) General rule. - There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * * (c) Charitable Contribution Defined. - For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of - (1) A State, a Territory, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.↩
4. In view of this conclusion, the burden of proof question is moot. ↩
5. The recent case of Jerome Scheffres, TCM 1969-41, presents a factual pattern strikingly similar to the case at bar.↩